2009 Ark. 90

**Timothy WALLACE, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 08–112.**

Supreme Court of Arkansas.

Feb. 26, 2009.

Hurst, Morrissey & Hurst, PLLC, by: Q. Byrum Hurst, Jr., Justin B. Hurst, and Josh Hurst, Hot Springs, for appellant.

Dustin McDaniel, Att'y Gen., by: Brad Newman, Ass't Att'y Gen., Little Rock, AR, for appellee.

ANNABELLE CLINTON IMBER, Justice.

Appellant Timothy Wallace was convicted by a Saline County jury of two counts of capital murder in the deaths of Brandy Wallace and Billy Hassel. Wallace was sentenced to two consecutive terms of life imprisonment without the possibility of parole. He now appeals, alleging that the circuit court erred in denying the following six motions: 1) the motion to suppress statements he made during a 911 call; 2) a motion for continuance; 3) the motion for change of venue; 4) a motion for mistrial; 5) the motion to suppress his statement to police; and 6) his motion for directed verdict. Because Wallace was sentenced to life imprisonment, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2008). We find no error and affirm.

At approximately 2:23 to 2:26 a.m. on June 26, 2005, Wallace placed a call to 911 and advised that he had shot his former wife and a male of her acquaintance. He continued his conversation with 911 dispatch for several hours, threatening to commit suicide and refusing to divulge his location. Deputies with the Saline County Sheriff's Office initiated a search. At approximately 5:30 a.m., Sergeant Mark Kyzer located Wallace in his parked pick-up truck in a rural section of Saline County. The call was transferred from 911 dispatch to Kyzer. Approximately one hour after Kyzer's arrival, several more deputies arrived on the scene and were instructed by Wallace, through his telephone conversation with Kyzer, to keep at a distance. At approximately 10:15 a.m., after Wallace had spoken with Kyzer for several hours, Detective Michael Frost initiated a conversation with Wallace and persuaded him to surrender. Frost and Kyzer transported Wallace to the Benton Police Department, which had jurisdiction over the investigation of the shootings.

Starting at 11:40 a.m. on the same date, Wallace was questioned at the Benton Police Department by Detective Patrick Baker, who was later joined by Prosecutor Robert Herzfeld. After being read his *Miranda* rights and signing a waiver-of-rights form, Wallace stated that he had gone to the home he used to share with Brandy without knowing that Hassel was there. He had given Brandy the marital residence in their uncontested divorce, and the divorce decree was filed only nine days earlier. Wallace offered alternating reasons for going to the house, stating that he wanted to retrieve some of his personal belongings, that he wanted to talk to Brandy, that the two had planned to spend the next day together with their children, and that he wanted to get his pistol so that he could kill himself. According to Wallace, Brandy initially refused to let him enter the home and then argued with him upon his entry. He claimed that he attempted to leave after retrieving his gun from a bedroom, but was physically attacked by Brandy, who began calling for Hassel. Hassel then attacked Wallace as well. Wallace opened the box containing the gun and began hitting Hassel on the head with the gun. He then removed the gun's lock, discarded the empty clip, loaded the gun, and began firing. After the initial shooting, Hassel "was trying to get up and said, 'I'm gonna kill you. I'm gonna kill you,'" whereupon Wallace shot Hassel again. He stated that he thought he had shot Brandy accidentally. After the shooting, Wallace

left in his truck and called 911 immediately from his cell phone. During the course of the interrogation at the police department, he wrote out a statement to the same effect.

According to Dr. Daniel Konzelmann, an associate medical examiner at the Arkansas State Crime Laboratory, Brandy suffered four gunshot wounds: one to the right thumb, characterized as a minor injury; one flesh wound to the right shoulder; one serious wound to the right upper arm that was possibly survivable; and one life-threatening wound to the right upper chest. There were also four exit wounds. In the medical examiner's opinion, the wounds to the thumb and shoulder could have been caused by a single shot. As a result of the wounds, she suffered damage to her lung and a perforated artery, which resulted in a lack of blood flow to the brain. Dr. Konzelmann testified that she probably lost consciousness in less than one minute. Approximately four to six additional minutes would have elapsed before irreversible brain injury set in.

Hassel sustained three gunshot wounds: one flesh wound to the left lower arm, one life-threatening wound to the left lower neck, and another life-threatening wound to the left upper neck, which would have caused a loss of motor functions and a complete inability to defend himself. There were three exit wounds, with the bullet from his left lower neck lodged just under the skin of his right chest. Hassel also suffered blunt force trauma, with scrapes to his forehead, a laceration to the back of his head, and a skin tear over the back of his neck. Dr. Konzelmann stated that these injuries could be considered consistent with the butt of a gun.

Jim Looney, a firearm and tool mark examiner with the Arkansas State Crime Laboratory, testified that three of four bullets recovered from the scene had been fired from Wallace's gun. Another bullet was too damaged to make a determination. He further testified that seven shell casings recovered from the scene had been discharged from Wallace's gun.

Wallace was charged with the murders on August 9, 2005. The information alleged that he had caused the deaths of Brandy Wallace and Billy Hassel with the premeditated and deliberated purpose of doing so, in violation of Arkansas Code Annotated section 5–10–101(a)(4) (Supp. 2005). The information was subsequently amended three times, to reflect that the State would seek the death penalty, to add a firearm enhancement, and to add the charge of failure to appear. The failure-to-appear charge was later nolle prossed, pursuant to Wallace's motion for severance. As a result of Wallace's flight to Canada and subsequent extradition, the State was forced to waive the death penalty. Wallace's trial was held on June 12, 13, and 14 of 2007. The circuit court accepted the jury's recommendation of consecutive life sentences without the possibility of parole. The jury found that Wallace had employed a firearm in the commission of the murders, but the State later waived the firearm enhancement. Wallace filed a timely notice of appeal of the judgment and commitment order.

### Motion for Directed Verdict

Wallace asserts on appeal that the circuit court erred in failing to grant his directed-verdict motion. The crux of his argument is that he lacked the requisite premeditation and deliberation for capital murder. He contends that he caused Hassel's death in self-defense and that Brandy's death was an accident. Although Wallace raises this issue as his final point on appeal, double-jeopardy concerns require that we review arguments regarding the sufficiency of the evidence first. *Bol-*

*din v. State*, 373 Ark. 295, 297, 283 S.W.3d 565, 567 (2008).

■ An appeal from a denial of a motion for directed verdict is a challenge to the sufficiency of the evidence. *Price v. State*, 373 Ark. 435, 438, 284 S.W.3d 462, 465 (2008). When reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict was supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence that is forceful enough to compel a conclusion one way or the other beyond speculation or conjecture. *Id.* The reviewing court views the evidence |₆in the light most favorable to the verdict and considers only evidence that supports the verdict. *Id.*

■ Circumstantial evidence may constitute substantial evidence to support a conviction. *Id.* The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Id.* This question is for the jury to decide. *Id.* Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

■ Finally, the credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* at 438–39, 284 S.W.3d at 465.

■ In accordance with Arkansas Code Annotated section 5–10–101(a)(4), a person commits capital murder if he or she causes the death of any person with the premeditated and deliberated purpose of causing the death of another person. This court has long held that the premeditation and deliberation required need not exist for a particular length of time; rather, they may be formed in an instant. *Reese v. State*, 371 Ark. 1, 3, 262 S.W.3d 604, 606 (2007). Moreover, an accused's intent or state of mind can rarely be proven by direct evidence. *Id.* Thus, we have acknowledged that a jury may infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used, the nature, extent, and location of the wounds inflicted, and the conduct of the |₇accused. *Id.* Furthermore, we have consistently entertained the presumption that one intends the natural and probable consequences of one's actions. *Coggin v. State*, 356 Ark. 424, 432, 156 S.W.3d 712, 717 (2004).

■ We hold that the evidence presented by the State was sufficient to support a jury's inference of premeditation and deliberation. We have already noted the evidence of multiple gunshots. In addition, Dr. Konzelmann testified that at least some of Brandy's wounds were inflicted at close range. Specifically, the autopsy of her body revealed powder stippling in the areas of her right arm, neck, and cheek, which indicated that the muzzle of the gun was close enough to deposit unburned or partially burned powder on her skin. This finding suggested that the shots were fired from no more than three feet away. We have previously considered evidence of multiple close-range gunshots to be consistent with a conclusion of premeditation and deliberation. *See, e.g., id.* at 434–35, 156 S.W.3d at 719. With regard to Hassel's injuries, the evidence indicated that the gunshots to his neck originated from behind. This court has upheld findings of premeditation in cases where the evidence showed that a victim was shot multiple times from behind. *See, e.g., Farris v. State*, 308 Ark. 561, 565, 826 S.W.2d 241, 244 (1992).

Other circumstances present at the crime scene support the jury's inference of premeditation and deliberation. For example, the State submitted evidence indicating that Brandy was attempting to leave the house before being shot. Photographs showed that Brandy was clutching her keys at the time of her death. In addition, the State introduced a recording of a 911 call placed by Brandy, in which she advised dispatch that her former husband was at her house with a gun. Dr. Konzelmann testified to stippling on her right upper and lower arm, which indicated that her arm was flexed at the time she was shot, possibly because she had been holding her cell phone to her ear. Photographs depicted Brandy's badly damaged cell phone, which appeared to have been hit by a bullet. Dr. Konzelmann also testified about the bullet found just beneath the surface of Hassel's skin, noting that the wound displayed some scraping around it, indicating shoring. Dr. Konzelmann explained that a shored exit suggests either tight clothing or a flat and unyielding surface against the skin at the time the bullet partially exited, causing the bullet to break the skin and then bounce back beneath the skin's surface. He testified that Hassel could have been against a wall or on the floor at the time of the infliction of that particular wound.

Wallace nonetheless maintains that his theory of self-defense was supported by the evidence. He notes that the evidence from the crime scene indicated that a fight had taken place, and offers the fact that the bullets entered the bodies from various directions as evidence that he was not taking aim at the victims. However, as previously noted, the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Brunson v. State*, 368 Ark. 313, 317, 245 S.W.3d 132, 136 (2006). In doing so, the jury may choose to believe the State's account of the facts rather than the defendant's. *Id.* Moreover, the State introduced evidence refuting Wallace's self-defense theory. For example, Detective Baker, who had examined the crime scene, testified that he found no evidence to indicate that more than one gun had been fired in the residence, and that there were no weapons or items that may have been used as weapons near the victims' bodies. Detective Baker also testified that Wallace did not display any defensive wounds. Dr. Konzelmann testified that neither of the victims' bodies showed signs of an altercation. Finally, Looney stated that Wallace's gun functioned properly when he test-fired it and that he did not test the "trigger pull" because there were seven shots, rather than the usual one shot indicating the possibility of an accident.

Lastly, evidence of Wallace's flight, both immediately after the murders and months later, following his release on bond, further supports the jury's verdict. It is well settled that flight is probative evidence of guilt. *Gillard v. State*, 366 Ark. 217, 221, 234 S.W.3d 310, 313 (2006).

In light of this evidence, we cannot say that the jury resorted to speculation and conjecture in reaching its verdict. The circumstances of the crime easily give rise to an inference of premeditation and deliberation. Accordingly, we affirm the circuit court's denial of Wallace's motion for directed verdict.

## Motion to Suppress 911 Call

Wallace argues that the statements he made during the course of his 911 call should have been suppressed for two reasons: he was in custody at the time the statements were made and had not been given the *Miranda* warnings, and the sheriff's deputies had offered a false

promise in order to procure a confession. In response, the State contends that Wallace has failed to demonstrate any error in the circuit court's ruling, as he has not identified any incriminating statements that were used against him at trial. The State further argues that Wallace's false-promise argument fails because the promise allegedly made was not, in fact, false.

On appeal of a circuit court's determination of voluntariness of a confession, we make an independent determination based upon the totality of the circumstances. *Clark v. State,* 374 Ark. 292, 299, 287 S.W.3d 567, 572 (2008). The ruling is reversed if it is clearly against the preponderance of the evidence, which we have interpreted as being the same standard as the clearly-erroneous standard. *Id.* Any conflict in the testimony of different witnesses is for the circuit court to resolve. *Id.* In essence, this court reviews the circuit court's findings of fact for clear error, and we make an independent, or de novo, determination of voluntariness. *Id.*

We are unable to fully address Wallace's *Miranda* argument, as neither the recording of the 911 call nor the transcript thereof appear in the record. The State indicated at the hearing on Wallace's motion to suppress that it did not intend to introduce the 911 call during its case-in-chief and would only rely upon it if needed to impeach Wallace's testimony, should he testify at trial. The State did not attempt to introduce either the recording or the transcript. In fact, counsel for Wallace attempted to introduce the transcript at trial, but the circuit court sustained the State's objection. In addition, counsel for Wallace elicited cross-examination testimony from Detective Frost regarding the substance of the 911 call. Otherwise, the only evidence of the call introduced at trial showed that it was made, that Wallace threatened suicide and refused to di-

vulge his location, and that he told dispatch of the shootings. Wallace's counsel cross-examined other witnesses about the 911 call, including Brandy's brother and Detective Baker; however, neither witness had personal knowledge of Wallace's statements. In sum, Wallace fails to point to any specific incriminating statement made during the 911 call that was erroneously admitted. Additionally, it was Wallace who attempted to bring out evidence of his statements. He cannot now be heard to complain of that for which he was responsible. *See Womack v. State,* 301 Ark. 193, 200, 783 S.W.2d 33, 36 (1990).

Moreover, even assuming that Wallace desired to suppress the fact that the call was made, or the fact that he informed 911 of the shootings, his argument still fails. For the first three hours of the eight-hour 911 call, up until the point at which Sergeant Kyzer located Wallace at approximately 5:30 a.m., it is clear that he was not in custody for *Miranda* purposes. As best we can tell from the record before us, Wallace spoke only to 911 dispatch during that time. He was alone in his vehicle, and law enforcement was unable to determine his location. Therefore, he could have ended the call at any point and gone wherever he desired. A person is in custody for purposes of the *Miranda* warnings when he or she is "deprived of his freedom by formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Hall v. State,* 361 Ark. 379, 389, 206 S.W.3d 830, 837 (2005) (quoting *Wofford v. State,* 330 Ark. 8, 28, 952 S.W.2d 646, 656 (1997)). In resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable person in the suspect's shoes would have understood the situation. *Id.* For the early portion of the 911 call, Wallace's freedom of movement was not

restrained at all. Thus, the procedural safeguards required by *Miranda* were inapplicable at that point, and any statements made prior to Kyzer's arrival were properly admitted.

We also do not find merit in Wallace's false-promise argument. The alleged false promise with which he takes issue was made by Detective Frost during the standoff and was apparently recorded as part of the 911 call. However, because the 911 call does not appear in the record, the only record of the statement was made during the suppression hearing, when Wallace's attorney quoted the statement during his cross-examination of Frost: "Did you not say that there's not a jury in this land that would convict a person being attacked by two people for defending themselves. Because what it boils down to is if you shoot somebody, you're in fear of your life, man, you're in the right on that?" Wallace argues on appeal that, due to this false promise, his incriminating statements during the 911 call were not made by free and deliberate choice.

It is well settled that a statement induced by a false promise of reward or leniency is not a voluntary statement. *Roberts v. State*, 352 Ark. 489, 499, 102 S.W.3d 482, 489 (2003). When a police officer makes a false promise that misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been made voluntarily, knowingly, and intelligently. *Id.* In deciding whether there has been a misleading promise of reward or leniency, this court views the totality of the circumstances and examines, first, the officer's statement and, second, the vulnerability of the defendant. *Id.*

In examining Frost's statement, we note that the detective merely promised that a jury would not convict someone who was acting in self-defense. He clearly did not promise that a jury would accept Wallace's self-defense theory. This court has long held that it is a *false* promise that renders a confession involuntary. *King v. State*, 317 Ark. 293, 302, 877 S.W.2d 583, 588 (1994) (citing *Tippitt v. State*, 285 Ark. 294, 686 S.W.2d 420 (1985)). Because there was nothing false about Frost's statement, we reject Wallace's argument and affirm the circuit court's denial of his motion to suppress.

*Motion for Continuance*

Wallace next contends that the circuit court erred in denying his motion for continuance made at the beginning of the second day of the three-day trial. One of Wallace's four attorneys advised that his car had been stolen the night before and that a number of files, documents, and exhibits pertaining to the case had been inside. The attorney requested time to gather the missing evidence and recompile his notes, emphasizing the importance of his notes for the cross-examination of Detective Baker, who was set to continue his direct examination at the beginning of the second day. Counsel for the State offered to furnish to defense counsel copies of the missing documents and exhibits and suggested that one of Wallace's attorneys attempt to recompile the notes for Baker's cross-examination during his continued direct examination, which would last an estimated three hours. The State also agreed to stipulate to certain evidence regarding phone records that could not be quickly obtained.

The circuit court instructed Wallace's counsel to recompile the notes during Baker's direct examination, stating, "I think that will be adequate time. But once the direct examination of Detective Baker is complete, I'll take that up again." Following direct examination, Wallace's

counsel proceeded with cross-examination without raising the issue again or requesting a ruling. An appellant must obtain a ruling on his or her argument to preserve the matter for this court's review. *Strong v. State*, 372 Ark. 404, 419, 277 S.W.3d 159, 170 (2008). The burden of providing a record sufficient to demonstrate error is upon the appellant. *Id.* Because Wallace has failed to provide such a record on this issue, we are precluded from addressing the merits of his argument.

### Motion for Change of Venue

Wallace next argues that he was denied his right to a fair trial by the circuit court's denial of his petition for change of venue. He claims that he was not given an impartial jury due to the excessive pretrial publicity in Saline County. Wallace points out that several members of the jury panel stated during voir dire that they had read about the case, seen coverage of the case on television, or heard about the case from other members of the community.

As a preliminary matter, the State alleges that the circuit court never ruled on Wallace's petition for change of venue and that the issue is, therefore, not properly preserved for this court's review. As the State points out, after hearing counsel's arguments on the petition at a pretrial hearing, the circuit court elected to withhold a ruling until the potential jurors' answers to questions on voir dire could also be considered. However, at a later pretrial hearing, the court noted that it had already denied the petition. Following questions from counsel, the circuit court elaborated:

> Well, what I did was, denied at that time subject to—I said both my review and any other information that y'all want considered.
>
> . . . .

But I did write down that I, I did remember reserving some option to change my mind. But at this point, at that point on April 16th, it was denied. I see no reason to review that at this time unless y'all want me to.

Counsel did not request that the issue be revisited at that time, and the petition for change of venue was not brought up again during the course of the trial. Accordingly, we conclude that the circuit court had denied the motion and that the issue is now properly before us.

The United States and Arkansas Constitutions entitle a defendant to a fair trial. *Swindler v. State*, 267 Ark. 418, 424, 592 S.W.2d 91, 94 (1979). If, because of pretrial publicity, an impartial jury cannot be seated to try a defendant, his right to a fair trial is violated. *Id.* However, a change of venue should only be granted when it is clearly shown that a fair trial is not likely to be had in the county. *Porter v. State*, 359 Ark. 323, 324, 197 S.W.3d 445, 446 (2004). This court reviews the denial of a motion for change of venue for abuse of discretion. *Id.* We conclude that Wallace has failed to meet this burden.

We have held that there can be no error in the denial of a motion for change of venue if the transcript of the jury-selection process shows that an impartial jury was selected, due to the fact that voir dire of the jury provides adequate safeguards against pretrial publicity. *Anderson v. State*, 357 Ark. 180, 202, 163 S.W.3d 333, 345 (2004). A review of the record in the instant case reveals that an impartial jury was selected. Only three of Wallace's thirteen jurors (including twelve jurors and one alternate) noted during voir dire that they had heard about the case either through the media or through other members of the community prior to trial. Two of those three jurors maintained that they would be able to set aside their prior

knowledge and form an opinion based only on the evidence presented at trial. Wallace moved to strike the third juror for cause, based upon her statement that she would like to hear the defendant's version of the case during the trial. However, when the State asked further questions of this juror, she stated that she could accept and apply the presumption of innocence and that she could follow the court's instructions concerning the fact that Wallace was not required to put on proof. Thus, we hold that this jury-selection process yielded an impartial jury free from the potential prejudices caused by excessive pretrial publicity. As we have stated, a defendant is not entitled to jurors who are totally ignorant of the facts surrounding the case, as long as they can set aside any impression they have formed and render a verdict solely on the evidence at trial. *Baughman v. State*, 353 ⎯Ark. 1, 9, 110 S.W.3d 740, 745 (2003).

In addition, we have held that affidavits filed in support of a motion for change of venue that cite little or nothing beyond an affiant's own conviction that a fair trial is not possible are insufficient to suggest an abuse of discretion. *Porter v. State*, 359 Ark. at 324, 197 S.W.3d at 447. Wallace's petition was supported by two such affidavits, which averred that in the affiants' opinions Wallace would not receive a fair trial in Saline County. This evidence, combined with evidence submitted by Wallace indicating a substantial amount of pretrial publicity, is insufficient to support a conclusion that the circuit court abused its discretion. Accordingly, we affirm the circuit court's denial of Wallace's petition for change of venue.

*Motion for Mistrial*

▉ For his next point on appeal, Wallace contends that the circuit court erred in failing to grant his motion for mistrial.

He made the motion following the discovery that prosecutors had inadvertently provided a juror with a copy of the transcript of Wallace's statement to police that contained notes and highlights made by the prosecutors. The transcripts were provided to each member of the jury while the video of Wallace's statement was played, but due to an oversight, the copy given to one particular juror had the State's notes written on it. Wallace argues on appeal that the State's notations suggested that he was guilty and characterized some of his comments made during the interrogation as admissions of guilt. He maintains that the evidence was inherently prejudicial.

▉ We are again precluded from addressing the merits of this argument. Following the circuit court's in-chambers questioning of the juror and the court's decision to excuse that particular juror, counsel for Wallace stated, "I'll withdraw my motion." This court has held that when an objection is withdrawn, it is as though the objection was never made. *Ramaker v. State*, 345 Ark. 225, 232, 46 S.W.3d 519, 523 (2001). Moreover, we will not consider arguments raised for the first time on appeal. *Id.* at 232, 46 S.W.3d at 524. Therefore, Wallace's challenge of the circuit court's denial of his motion for mistrial is not properly before us.

*Motion to Suppress Statement to Police*

Finally, Wallace argues that the circuit court erred in failing to suppress his statement to Detective Baker. He asserts that the statement was taken in violation of his rights, as he invoked his right to the assistance of counsel by asking if he needed an attorney. Wallace alleges that Baker ignored this question and proceeded to interrogate him. He acknowledges that he signed a waiver-of-rights form but contends that

it became invalid after his request for the assistance of an attorney. In response, the State argues that Wallace's question was not an unequivocal invocation of his right to counsel and was thus insufficient as a basis for the conclusion that Baker should have ceased questioning.

The key question for our consideration is whether Wallace sufficiently invoked his right to the assistance of counsel. The United States Supreme Court has made it clear that when invoking the *Miranda* right to counsel, the accused must be unambiguous and unequivocal. *Holsombach v. State*, 368 Ark. 415, 421, 246 S.W.3d 871, 876 (2007) (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). An equivocal request for counsel does not obligate the police to cease questioning and seek clarification, but interrogation may continue until the suspect clearly requests counsel. *Id.* As the United States Supreme Court has stated, an accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Furthermore, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461, 114 S.Ct. 2350.

Here, when Baker asked Wallace if he understood that he had the right to talk to an attorney before any questioning and to have an attorney present with him during questioning, Wallace responded, "Yes sir. Do I need one?" The following colloquy ensued:

DETECTIVE BAKER: That's up to you.

WALLACE: I don't know.

DETECTIVE BAKER: I mean, that's your right. I can't tell you yes or no, you know. That's a decision you have to make for yourself. Do you understand that if you cannot afford to hire an attorney, one will be appointed by the court for you prior to any questioning at no cost to you.

WALLACE: Yeah, I understand. I can't afford one right now.

DETECTIVE BAKER: Do you understand that if you decide to answer questions now you can decide to stop answering questions any time and that you can stop answering questions at any time until you talk to an attorney.

WALLACE: Yes, sir.

Wallace then signed to indicate that he understood his rights and signed again to indicate that he waived his rights.

We have previously addressed this precise issue. *See Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006); *Higgins v. State*, 317 Ark. 555, 879 S.W.2d 424 (1994). In *Flanagan*, the accused, upon being re-Mirandized, asked, "Do I need to call an attorney?" 368 Ark. at 159, 243 S.W.3d at 877. Similarly, in *Higgins*, the accused was read the *Miranda* warnings and signed a form indicating that he understood his rights; thereafter, he asked, "Do you think I need a lawyer?" 317 Ark. at 557, 879 S.W.2d at 425. In both cases, upon considering whether such questions constituted an unequivocal request for the assistance of counsel, this court concluded that the reference to an attorney "was surely ambiguous and hardly amounted to the sort of direct request required to invoke [the] Fifth Amendment right to counsel." *Flanagan*, 368 Ark. at 160, 243 S.W.3d at 878; *Higgins*, 317 Ark. at 563, 879 S.W.2d at 428. In *Higgins*, we likened the accused's remark to that at issue in *Davis v. United States, supra*, wherein the

accused stated, "Maybe I should talk to a lawyer." *Higgins,* 317 Ark. at 562, 879 S.W.2d at 427.

The question Wallace posed to Baker is analogous to the questions at issue in *Flanagan* and *Higgins.* As we held in those cases, it did not amount to the type of unequivocal request required to force an interrogating officer to cease questioning. Therefore, we affirm the circuit court's denial of Wallace's motion to suppress his statement.

### *Rule 4–3(h) Review*

In compliance with Arkansas Supreme Court Rule 4–3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Wallace, and no prejudicial error has been found. *Boldin v. State,* 373 Ark. 295, 283 S.W.3d 565 (2008).

Affirmed.