2009 Ark. 336

**Darius JACKSON, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 08–459.**

Supreme Court of Arkansas.

June 4, 2009.

Rehearing Denied Sept. 10, 2009.

Ronald L. Davis, Jr. Law Firm, PLLC, by: Ronald L. Davis, Jr., Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Deborah Nolan Gore, Ass't Att'y Gen., for appellee.

PAUL E. DANIELSON, Justice.

Appellant Darius Jackson appeals the judgment and commitment order of the Pulaski County Circuit Court finding him guilty of capital murder and sentencing him to life imprisonment without the possibility of parole. On appeal, Jackson argues that: (1) the evidence was insufficient to support his conviction for capital murder; (2) the circuit court erred in failing to grant a continuance after an expert witness allegedly changed his testimony; and (3) the circuit court erred by allowing an interference with jury deliberations. We affirm Jackson's conviction and sentence.

The record reveals the following facts. On April 14, 2006, Nikeya Miles, the then-two-year-old daughter of Shakenya Dooley, spent the night along with her mother at the home of Jackson, Ms. Dooley's boyfriend, and Magnolia Littles, Jackson's mother. Jackson's then-one-year-old daughter, Princess, was also there. The next morning, Magnolia Littles left the house to go shopping while the others watched television in the living room at the front of the home. At some point, Jackson picked up both of the girls and walked toward the back of the house. When Jackson returned to the living room, Ms. Dooley noticed that Nikeya's eyes were "bugged out" and that she was having trouble breathing. When Ms. Dooley asked Jackson what was wrong with Nikeya, Jackson stated that nothing was wrong, she was just "faking."

Ms. Dooley took Nikeya to the guest room to lay her down on the bed. She thought Nikeya might be hungry, so she went to the kitchen to fix some ramen noodles. She checked on her a few times, but when the noodles were ready, Nikeya was no longer in the guest bedroom. Ms. Dooley found Nikeya lying motionless on the couch in the living room with her eyes rolled back in her head and gasping for air. After unsuccessfully attempting to call her uncle, a doctor, and a nurse she worked with, Ms. Dooley called 911. However, she was instructed by the operator to give the phone to someone who could talk because she was hysterical and could not be understood.

Sergeant Chris Ameling with the Pulaski County Sheriff's Office was the first to respond. Jackson met him at the door. Ameling and the EMT team were escorted to the guest room. Ameling saw Nikeya lying on the middle of the bed, with her hands at her side and her eyes rolled back in her head. He could see that Nikeya was having trouble breathing. While the EMT team was working on Nikeya, Ameling asked Jackson what happened. Ameling testified that Jackson told him that Nikeya had taken a nap, that they heard a scream, and that when they went to the bedroom to see what was wrong, they found her in her current condition. Before everyone left to accompany Nikeya to the hospital, Ameling asked both Jack-

son and Ms. Dooley for their identification. While Ms. Dooley cooperated, Jackson asked Ameling, "What do you need that for?"

Not long after arriving at Arkansas Children's Hospital, family and law-enforcement officers were informed that Nikeya had died. James Barnes, an investigator with the Pulaski County Sheriff's Office, took Jackson back to the house after they left the hospital. He asked Jackson if he would give a statement, and Jackson agreed. Barnes drove Jackson to his office and took his statement that afternoon, April 15, 2006. In the statement given to Barnes, Jackson stated that he noticed that day that Nikeya's "eyes got bucked" and that "her lip was . . . so chapped" that he thought maybe she was dehydrated. He explained that she had been playing with her Easter basket and when he came back into the room he found her on the couch with her eyes rolled back in her head. At that point, Jackson stated, he grabbed Nikeya, yelled for her mother, tried to give her some water, and then laid her on the guest bed. Barnes testified that Jackson was nonchalant during the time he gave his statement.

Between April 15, 2006, and April 19, 2006, Sergeant Mike Blain with the Pulaski County Sheriff's Office received the initial findings from Nikeya's autopsy from the medical examiner's office and began a criminal investigation based on the injuries Nikeya had sustained. As part of his criminal investigation, Blain interviewed Ms. Dooley, Ms. Littles, and Jackson. Blain testified that he had reviewed Jackson's previous statement and then informed Jackson about the internal injuries to Nikeya found by the medical examiner. Blain testified that he then received a different statement from Jackson.

In Jackson's statement to Blain, he claimed that Nikeya and Princess were in his room playing while Ms. Dooley was on the phone. Jackson claimed that when he saw that Ms. Dooley got off of the phone, he picked up both girls to take them back in the room with Ms. Dooley. Jackson described carrying Princess on his left side, with her chest facing him, and carrying Nikeya in his right arm facing away from him. According to Jackson, as he was walking with the girls, he tripped over a basket of clothes and fell, dropping Princess and falling directly on top of Nikeya. Jackson stated that Nikeya simply turned and looked at him, so he picked the girls back up and took them to the living room. It was at that point, Jackson claimed, Nikeya's eyes were "bucked" and Ms. Dooley grabbed her, eventually taking her to lay down in the guest bedroom and fixing her noodles.

Dr. Frank Peretti, a forensic pathologist and the medical director at the Arkansas State Crime Lab, determined that Nikeya's cause of death was from multiple blunt-force injuries and ruled her death a homicide. Nikeya had multiple bruises on and under her scalp. Her chest was bruised and the autopsy revealed that her right lung was severely bruised and had been completely detached from her windpipe, causing her to bleed into her right chest cavity. The blood in her chest extended up into her neck via the right carotid sheath, the soft tissue surrounding her right carotid artery. In addition to Nikeya's head and chest injuries, there were also injuries throughout her abdomen. Nikeya suffered from a lacerated and extensively torn liver, a lacerated and bruised pancreas, and multiple contusions and hemorrhages throughout her abdomen.

In Dr. Peretti's opinion, Nikeya died because she could not breathe and from the amount of internal bleeding. He also concluded that Nikeya had suffered some sort of compressional asphyxia because of

how much force is required to detach a lung from the windpipe and blood vessels, as Nikeya's was. Dr. Peretti stated that his conclusion was further supported by the fact that blood was found going into Nikeya's neck from her chest through the right carotid sheath, as the blood would have been forced to travel up the sheath if pressure was applied to the abdomen in such a manner that it caused the organs to burst or rupture, as Nikeya's did. Dr. Peretti explained that such injuries could have been the result of a very forcible squeeze or by a foot being forcibly applied to the abdomen. He did not believe the injuries could have been sustained by someone falling on top of Nikeya from behind because there were not more diffuse injuries. Had Nikeya fallen face down, Dr. Peretti concluded, it would not explain the multiple injuries to the back of her head.

A jury convicted Jackson of capital murder for Nikeya's death, and this appeal followed. Jackson first argues that there was not sufficient evidence to support the charge of capital murder. The State avers that substantial evidence supports the conviction.

Our standard of review for a sufficiency challenge is well settled. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *See Cluck v. State*, 365 Ark. 166, 226 S.W.3d 780 (2006). We affirm a conviction if substantial evidence exists to support it. *See id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *See id.*

Furthermore, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *See id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *See id.* The credibility of witnesses is an issue for the jury and not the court. *See id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *See id.*

A person commits capital murder if:

Under circumstances manifesting extreme indifference to the value of human life, the person knowingly causes the death of a person fourteen (14) years of age or younger at the time the murder was committed if the defendant was eighteen (18) years of age or older at the time the murder was committed.

Ark.Code Ann. § 5–10–101(a)(9)(A) (Repl. 2006).

For his sufficiency argument, Jackson first argues that Dr. Peretti's testimony was not to a certain degree of medical certainty because he was inconsistent about when Nikeya had most likely sustained certain old internal injuries. However, this argument is more appropriately developed as Jackson's second point on appeal. In viewing the evidence in the light most favorable to the State, the evidence regarding the possible time frame of old injuries sustained by Nikeya is irrelevant. Dr. Peretti testified that while there were some old injuries to Nikeya's pancreas and liver, they were not related to what caused her death on April 15, 2006. Dr. Peretti testified as to all of the acute injuries suffered by Nikeya, such as the contusions found on the back of her head, her detached lung, her lacerated liver, and the massive bleeding throughout her abdomen, and concluded that those injuries would have occurred only minutes before her death.

It is undisputed that Jackson was the last person seen with Nikeya before Ms. Dooley noticed that her eyes were bugged out, which Dr. Peretti described as an effect of compressional asphyxia. An essential element the State had to prove was that Jackson acted "knowingly." *See id.* A person acts knowingly with respect to:

(A) The person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist; or

$|_8$(B) A result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result;

Ark.Code Ann. § 5–2–202 (Repl.2006). This court has recognized that the requisite intent for capital murder can be inferred by the nature, extent, and location of the victim's wounds. *See Sanders v. State,* 340 Ark. 163, 8 S.W.3d 520 (2000). Given the evidence in this case, the jury could have concluded that Nikeya's injuries were too severe to have been an accident.

■ As in many cases, much of the testimony was conflicting. Jackson's defense at trial was that he had accidentally fallen over a clothes basket while carrying Nikeya and landed on top of her. However, during Dr. Peretti's testimony, he explained why he did not believe Nikeya's injuries were consistent with that scenario. The weight of the evidence, even expert testimony, is within the province of the jury and of the jury alone. *See Anderson v. State,* 357 Ark. 180, 163 S.W.3d 333 (2004). Jackson had told Sergeant Ameling that Nikeya woke up from a nap screaming and that they found her in the condition that she was in when Ameling arrived. Testimony revealed that Jackson did not give the explanation that he had tripped over a clothes basket and fallen on Nikeya until after Sergeant Blain informed

him of the internal injuries suffered by Nikeya. While Jackson's mother, Ms. Littles, claimed that she had picked up the house and moved a clothes basket after Nikeya had been taken to the hospital, the law-enforcement officials did not observe, nor did any of the pictures taken in the home reveal, a clothes basket in any part of the hallway or $|_9$bedroom, as described by Jackson. In addition, Investigator Barnes testified that Ms. Littles had told him that she had not moved anything. We have long held that issues of credibility are to be left to the jury and that the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *See Wallace v. State,* 2009 Ark. 90, 302 S.W.3d 580.

Finally, other relevant circumstantial evidence was presented to the jury that could have served as corroborating evidence of Jackson's guilt. Ms. Dooley testified that she had left Nikeya in the sole care of Jackson while she was working late one night in the days prior to Nikeya's death. When Ms. Dooley got back from work, Nikeya had a busted lip and a knot on her head. Ms. Dooley testified that Jackson's explanation to her was that Nikeya fell off of a slide while playing. In the weeks after Nikeya's death, Ms. Dooley still had contact with Jackson. Although he never mentioned the death of Nikeya, he did erase all of Nikeya's pictures from Ms. Dooley's cell phone. Ms. Dooley testified that when she broke off the relationship with Jackson in light of Nikeya's death, he took her phone and deleted all the photos of Nikeya, while leaving her other photos in place.

After reviewing the evidence in the light most favorable to the State, we cannot say that the evidence was insufficient to support Jackson's conviction and, therefore, we affirm it.

For his second point on appeal, Jackson argues that the circuit court erred by denying his motion for continuance based on his contention that an expert witness, Dr. Peretti, had changed his medical opinion. The State avers that the circuit court did not abuse its discretion in denying Jackson's motion and that no prejudice resulted from the denial.

A motion for continuance is left to the sound discretion of the circuit court, and its judgment will not be reversed on appeal in the absence of a clear abuse of that discretion. *See Stenhouse v. State,* 362 Ark. 480, 209 S.W.3d 352 (2005). The burden of establishing an abuse of the circuit court's discretion falls squarely on the shoulders of the appellant. *See id.* An appellant must not only demonstrate that the circuit court abused its discretion by denying the motion for a continuance, but also must show prejudice that amounts to a denial of justice. *See Cherry v. State,* 347 Ark. 606, 66 S.W.3d 605 (2002).

Our criminal rules provide that a court shall grant a continuance "only upon a showing of good cause and only for so long as necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public interest in prompt disposition of the case." Ark. R.Crim. P. 27.3 (2007).

In the instant case, Jackson filed his motion to continue on October 8, 2007, the day before his trial was scheduled, alleging that Dr. Peretti had changed his medical opinion from concluding that certain old internal injuries found during Nikeya's autopsy were at least seven to ten days old to indicating that they may have occurred within three days of her death. Jackson argued that this change in opinion did not occur until Friday, October, 5, 2007, and was not disclosed to him until Monday, October 8, 2007, which did not give him sufficient time to make beneficial use of the evidence. The circuit court held a pretrial hearing on the motion and determined that the motion would be denied, but that if Dr. Peretti had truly changed his opinion, then the evidence regarding the timing of the old injuries would not be allowed.

The record reveals that in Dr. Peretti's original report, he found two distinct sets of injuries to Nikeya. He had discovered a pattern of injury to Nikeya's pancreas and liver that were days old, but were beginning the process of healing. Additionally, Dr. Peretti discovered all the acute injuries that actually caused Nikeya's death, which, Dr. Peretti opined, she sustained minutes before her death. At the time of his report, Dr. Peretti concluded that the old injuries most likely occurred seven to ten days before her death. At a pretrial meeting, Dr. Peretti was asked if those old injuries could have happened as early as three days before her death rather than seven to ten. He answered that it was possible, but continued in court to state that based upon his experience, he believed it was seven to ten days prior.

The testimony of Dr. Peretti that Jackson specifically cites as being inconsistent was elicited during voir dire of Dr. Peretti, outside the presence of the jury, and, therefore, was not part of the evidence considered by the jury in determining Jackson's guilt. Additionally, Jackson's counsel was the party responsible for eliciting the testimony regarding the timing of the old injuries that was presented in front of the jury. In that testimony, Dr. Peretti admitted that since the time of his first report he had been asked if the old injuries could have been as recent as two or three days prior to Nikeya's death and that he had stated it was possible. However, Dr. Peretti maintained in front of the jury that, while everyone heals differently and he could not say for certain, based on

his opinion and experience those injuries had occurred seven to ten days prior to Nikeya's death. Dr. Peretti explained that he knew the importance of his report and that when he originally gave the opinion, he meant it to be interpreted that the old injuries occurred a minimum of seven to ten days prior to Nikeya's death.

Based on the above, we cannot say that the circuit court abused its discretion by not finding good cause to grant the motion for continuance. Additionally, Jackson did not establish that prejudice amounting to a denial of justice had occurred by the circuit court's denial. Dr. Peretti never claimed that his true opinion had changed and that he now believed the old injuries actually occurred only two or three days prior to Nikeya's death. Dr. Peretti maintained that his opinion based on his experience was that the old injuries were seven to ten days old. Because there was not an abuse of discretion and Jackson did not demonstrate that he was prejudiced by the denial of his motion, we affirm the circuit court's denial of his motion.

■■■ For his final argument, Jackson contends that the circuit court violated Arkansas Code Annotated § 16–89–125 (Repl.2005)[1] by allowing the court reporter into the jury room. The State avers that the circuit court did not violate section 16–89–125 because there was no danger that the jury received any evidence that had not been previously admitted in trial and, therefore, there were no "further steps" taken with respect to the evidence.

During jury deliberations in the instant case, the jury requested to hear the two audio-taped statements of Jackson and to hear a replay of some of the testimony from trial. The circuit court allowed Jackson's recorded statements to go back with the jury. Further, over Jackson's objec-tion, the circuit court allowed the court reporter to replay the taped testimony of Dr. Peretti for the jury. It was necessary to have the court reporter present because the recording of Dr. Peretti's testimony was accomplished by a "WAV" file on the court reporter's computer. The jury was brought into the courtroom and instructed that they were not to speak or otherwise communicate during the replaying of the testimony, other than the jury foreman who was permitted to tell the court report-er when to adjust the volume or to stop, rewind, or play the testimony. The court reporter was sworn and the courtroom was cleared of everyone except the court reporter and the jurors. The court reporter played the testimony of Dr. Peretti for the jury and, after the testimony was replayed, the jurors returned to the jury room.

Arkansas Code Annotated § 16–89–125(e) provides:

> After the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence or if they have a desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the informa-tion required must be given in the pres-ence of or after notice to the counsel of the parties.

This court has held that the purpose of section 16–89–125(e) is to protect against any further steps being taken with respect to evidence unless done in open court with counsel present. *See Anderson v. State,* 367 Ark. 536, 242 S.W.3d 229 (2006).

Jackson specifically states that he is not alleging that the information should not have been offered to the jury during their deliberations as it had all been admitted into evidence at trial. However, Jackson

---

1. Although Jackson's brief cites to Ark.Code Ann. § 15–89–125, it appears to be a typo-graphical error as the relevant statute is sec-tion 16–89–125.

contends that because the evidence was reviewed by the jury in the presence of the court reporter, there was a possibility of tainting or prejudice and there was not strict compliance with section 16–89–125(e).

The facts of this case are similar to those presented to this court in *Anderson, supra.* In *Anderson,* the deliberating jury was allowed to replay an out-of-court statement that had been admitted into evidence and made an exhibit during the trial. This court held that the replaying of evidence that had previously been admitted during trial was not a critical stage in criminal proceedings and that nothing indicated that the appellant had suffered any prejudice by the replaying of the tapes. *See Anderson, supra; see also Davlin v. State,* 313 Ark. 218, 853 S.W.2d 882 (1993) (where this court held the circuit court did err in allowing the deliberating jury to play a videotape that contained information which was neither admitted into evidence nor played at trial because the record was silent as to what actually happened during the playback). While Jackson cites this court to *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), to support his contention that the presence of the court reporter in itself was error, his reliance is misplaced as the Court did not find actual prejudice when alternate jurors were present during jury deliberations because there was no specific showing that there was any participation by those alternate jurors in the form of body language or otherwise.

In the instant case, there is no dispute that the information played back to the jury had already been admitted into evidence. The court reporter was simply present to operate the equipment needed to replay the information. Jackson failed to demonstrate prejudice by the replaying of evidence previously admitted into evidence during trial or by the mere presence of the court reporter. Therefore, we affirm on this point as well.

For all of the above reasons, we affirm Jackson's conviction and sentence. Pursuant to Arkansas Supreme Court Rule 4–3(i) (2009), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to the appellant, and no prejudicial error has been found.

Affirmed.

CORBIN and IMBER, JJ., concurring.

HANNAH, C.J., dissenting.

ANNABELLE CLINTON IMBER, Justice, concurring.

I agree with the majority that this case must be affirmed in accordance with the precedent set forth in *Anderson v. State,* 367 Ark. 536, 242 S.W.3d 229 (2006). However, I write separately to address the troubling practice of permitting the court reporter to re-present evidence for the jury while neither the court, the defendant, nor the parties' counsel are present in the courtroom.

In interpreting Arkansas Code Annotated section 16–89–125(e) (Repl.2005), we have stated that its purpose is to protect against misinformation communicated to the jury. *Anderson,* 367 Ark. at 540, 242 S.W.3d at 232–33 (citing *Sanders v. State,* 317 Ark. 328, 878 S.W.2d 391 (1994)). In situations such as this one, where the jury is brought into the courtroom for communication with court personnel outside of the presence of the court, the parties, and their counsel, the danger of communicating misinformation is particularly high—not because the court reporter will necessarily misrepresent the evidence, but because the usual safeguards inherent in courtroom settings are absent. Had there been some allegation of misconduct in this case, either

on the part of the court reporter or the jurors, Jackson and his counsel would not have the benefit of a record to show prejudicial error. In essence, the jury could have continued its deliberations in the presence of the court reporter, or even allowed the court reporter to participate in its deliberations, and neither Jackson nor the court would have known.

Moreover, a court reporter who is representing evidence for the jury may be unable to simultaneously create a record of the re-presentation. We have stated that the State cannot meet its burden of rebutting the presumption of prejudice when there is no record of what occurred during the re-presentation of the evidence. *Davlin v. State*, 313 Ark. 218, 221–22, 853 S.W.2d 882, 884–85 (1993). I agree with the majority that the instant case differs from the fact situation presented in *Davlin*, wherein there was no assurance that the replaying of a videotape of the victim's statement omitted portions that were not admitted into evidence at trial. *Id.* Here, there is no dispute that the evidence represented for the jurors had already been admitted and viewed by them. However, the manner in which the evidence was re-presented makes review of the re-presentation difficult, if not impossible.

Because the evidence re-presented for the jury in the present case had been admitted at trial, I cannot say that there was reversible error under this court's decision in *Anderson v. State, supra*.[1] Nonetheless, the better practice would have been for the circuit court to require the presence of Jackson and counsel for both sides, and the court itself, during the re-presentation of the testimony. Such a scenario would have resulted in far less risk of reversible error and far greater confi-

dence in the outcome of the trial. For these reasons, I concur.

CORBIN, J., joins this concurrence.

JIM HANNAH, Chief Justice, dissenting.

I respectfully dissent. This case should be reversed and remanded because the circuit court erred in ordering the court reporter to play the reporter's back-up audio tape of the testimony of Dr. Peretti for the jury when the circuit judge, the defendant, and the parties' counsel were not present in the courtroom. Contrary to the suggestions of the majority and the concurrence, this case is distinguishable from *Anderson v. State*, 367 Ark. 536, 242 S.W.3d 229 (2006); the *Anderson* case does not require that the instant case be affirmed.

In *Anderson*, we held that the circuit court did not err, in violation of section 16–89–125(e), when it allowed the jury during deliberations to receive and replay a tape recording of Anderson's statement that had been played at trial and received into evidence. Presumed prejudice was overcome in that case because "the jury received an admitted exhibit where there was no danger of additional evidence being introduced by giving the exhibit to the jury during deliberations." *Anderson*, 367 Ark. at 541, 242 S.W.3d at 233. *See also Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006) (stating that, pursuant to section 16–89–125(e), the circuit court did not err in making available to the jury during deliberations taped statements that had already been played for the jury during trial and admitted into evidence). Here, the back-up audio tape was not played to the jury at trial, was never admitted into

---

1. I remain convinced that the majority opinion in *Anderson* failed to abide by our prior holding in *Davlin v. State, supra,* requiring the State to rebut the presumption of prejudice resulting from noncompliance with section 16–89–125(e). *See Anderson v. State, supra* (Imber, J., dissenting).

evidence, and was not made part of the record, making it impossible for this court to review.[1]

What further distinguishes the instant case from *Anderson* is that, in *Anderson*, no outside party joined the jury during deliberations. The court reporter's presence, outside the presence of the circuit court, the defendant, and the parties' counsel, is prejudicial on its face. Section 16–89–125(e) sets forth the procedure by which a circuit court must proceed when the jury has a disagreement or desires to be informed on a point of law. It specifically requires that the jury be conducted into court, and at that time, the information required must be given in the presence of, or after notice to, counsel. That is the sole procedure to be followed. The statute in no way authorizes what took place in this case, and what distinguishes this case from *Anderson*, is that the *court reporter* was left alone with the jury to play a back-up audio tape of testimony admitted at trial. Noncompliance with section 16–89–125(e) gives rise to a presumption of prejudice, which the State has the burden of overcoming, and the State has in no way done so in the instant case. Because the procedure used in this case clearly violates the statutorily mandated procedure and because Jackson's due-process rights under the United States Constitution and Arkansas Constitution were violated, this case should be reversed and remanded.

---

1. There was no objection made that the back up audio tape was not evidence pursuant to

Arkansas Code Annotated § 16–89–125(e).