Jairo MONTGOMERY *v.* STATE of Arkansas

CR 06-62                                        241 S.W.3d 753

Supreme Court of Arkansas
Opinion delivered October 26, 2006

*W. Ray Nickle*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. Appellant Jairo Montgomery was convicted of possession of methamphetamine with intent to deliver, and he was sentenced to a term of 420 months in the Arkansas Department of Correction. For reversal, Montgomery argues that the circuit court erred: (1) in denying his motion for change of venue; (2) in denying his motion to suppress; (3) in allowing the State to introduce tape-recorded conversations without showing one party's consent to the recording, as required by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.*; and (4) in denying his request to submit a jury instruction on entrapment. The court of appeals certified this case to this court pursuant to Ark. Sup. Ct. R. 1-2(b)(1) and (5), as a case involving an issue of first impression, and one needing clarification or development of the law. We find no error and affirm.

While the sufficiency of the evidence has not been challenged, we will briefly summarize the facts. On November 8, 2003, officers from the Paragould Police Department executed a search warrant for Billy Sheridan's residence, located at 731 West Locust, in Paragould. During the search, a cell phone rang several times. Officer Rhonda Thomas answered the phone, and the male caller asked to speak with Sheridan. Thomas told the caller that Sheridan could not come to the phone, and she asked the caller if he wanted her to give Sheridan a message. Thomas testified that the caller, who was subsequently identified as Montgomery, said, "[T]ell him this is Jau and tell him it's good, it's all good." Thomas then told Officer Arvin Volner about the conversation. Volner testified that Sheridan agreed to cooperate with the police, so Volner instructed Sheridan to call Montgomery in an attempt to set up a controlled delivery of methamphetamine. Sheridan arranged for the delivery, and Montgomery and others arrived with the substance at the designated time. Montgomery was arrested and taken to the Paragould Police Department, where Volner interviewed him the next day. In a recorded statement, Montgomery admitted to Volner that he possessed methamphetamine and intended to deliver it to Sheridan.

### Denial of Motion for Change of Venue

Montgomery first argues that the circuit court erred in denying his motion for a change of venue from Greene County.

This court has held that a criminal case may be removed to a circuit court of another county upon a showing that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had. *Collins v. State*, 338 Ark. 1, 991 S.W.2d 541 (1999). The burden is on the defendant to show the general mindset of the populace and the concomitant impossibility of receiving a fair trial. *Id.* In making a determination of the accused's ability or inability to receive a fair trial, the trial court has an opportunity to observe witnesses and to make a determination as to whether or not a particular mindset or prejudice pervades the entire county. *Id.* We will not disturb the finding of the trial court in an absence of an abuse of discretion. *Id.* There can be no error in the denial of a change of venue if the examination of the jury selection shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court. *Singleton v. State*, 337 Ark. 503, 989 S.W.2d 533 (1999). In addition, a defendant cannot show that he was prejudiced by the denial of a motion for change of venue if he failed to exhaust all of his peremptory strikes. *Id.*

Prior to trial, Montgomery filed a motion for change of venue, based on "his own personal knowledge that a black person will not be treated fairly in Paragould." He also submitted identical affidavits from a number of persons who stated that they did not believe that a black person would be treated fairly in Paragould.[1]

At a hearing on Montgomery's motion, Trichia Dunn, Montgomery's fiancee, testified that she lived in Trumann, in Poinsett County, and had never lived in Greene County. Dunn is white, and Montgomery is African-American. Dunn stated that when Montgomery was arrested, Officer Volner asked her why she "would want to be with a nigger" who got her into trouble. Dunn stated that Volner made it clear to her that he did not approve of her relationship with Montgomery. Dunn also stated that a little boy she saw in the courthouse lobby said "nigger, nigger, nigger," when he saw Montgomery. The boy's grand-mother apologized to Montgomery and Dunn. On cross-examination, Dunn testified that she believed that Volner's com-

---

[1] The town of Paragould is located in Greene County. Though Montgomery argues that he cannot have a fair trial in Paragould, for the purpose of a change of venue, he must demonstrate that the minds of the inhabitants of the *county* are so prejudiced that he may not have a fair trial.

ment was representative of other citizens of Greene County, even though she had never lived there and Volner had since been dismissed by the police department and had moved to Crossett.

Ricky Hishaw, a white male, testified that he lived in Greene County from 2000 to 2005. He stated that Paragould was known as a place where African-Americans are "not welcome a lot," and that he did not think Montgomery could get a fair trial in Paragould. When asked if he knew of specific instances where African-Americans had been mistreated in Greene County, Hishaw stated that he did not. He testified that some persons "backed off" from him when they learned that he had black friends. He also stated that he had seen "rebel" flags on vehicles in Greene County; however, he admitted on cross-examination that he had seen such flags on vehicles in other counties as well. Hishaw also recounted that he had heard rumors of a sign in town warning African-Americans to leave before sundown, but he had never seen the sign, nor did he have personal knowledge of the existence of the sign.

After hearing testimony, the circuit court concluded that Montgomery had failed to prove that the mindset of the general population of Greene County was such that an African-American could not receive a fair trial. Montgomery contends that the circuit court should have granted his motion for change of venue because he presented proof that there was countywide prejudice against black people in Greene County, and because the State called no witnesses to rebut the testimony of Dunn and Hishaw. As previously noted, the burden is on the defendant to show that a fair trial cannot likely be had in the county. *See, e.g., Richardson v. State*, 292 Ark. 140, 728 S.W.2d 189 (1987). The State is not required to rebut the defendant's testimony. The issue is whether a defendant presents sufficient proof.

The State contends that the circuit court was within its discretion to find that Montgomery had failed to show that it would be impossible to select an impartial jury in Greene County. The State argues that neither of Montgomery's witnesses demonstrated a general knowledge about the state of mind of inhabitants of Greene County or of prejudice existing throughout the county to such an extent that a fair trial could not be had. In support of this argument, the State points out that Dunn had never lived in Greene County, and that she related stories concerning only two persons: a police officer who no longer lived in Greene County and a young boy who was in the courthouse. The State contends

that, as unfortunate as the two instances Dunn cited were, they did not prove that racial prejudice existed in Greene County to such an extent that an impartial jury could not be seated. As to Hishaw's testimony, the State contends that, while Hishaw testified that it was known that blacks were not welcome in Greene County, he could cite no specific instance of mistreatment against African-Americans based on their race. The State's argument is well taken. We hold that the circuit court did not abuse its discretion in denying Montgomery's motion for change of venue.

■ Further, the State points out that jury selection was not included in the record on appeal, so it is not known how the jurors responded to the questions they were asked, if Montgomery exhausted his peremptory strikes, or if he objected to the jury that was selected to hear the case.[2] The burden of providing a record sufficient to demonstrate that reversible error has occurred is upon the appellant. See *McGhee v. State*, 330 Ark. 38, 954 S.W.2d 206 (1997). Here, in the absence of such a record, Montgomery has failed to show that he did not receive a fair trial.

### Denial of Motion to Suppress

Montgomery argues that the circuit court erred in denying his motion to suppress a statement he gave to Officer Volner because Volner obtained the statement by making false promises to him. In *Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005), we stated:

> We note at the outset that a statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In order to determine whether a waiver of *Miranda* rights is voluntary, we look to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* When we review a trial court's ruling on the voluntariness of a confession, we make an independent determination based on the totality of the circumstances. *Id.*

---

[2] In fact, Montgomery makes no argument that the jury that was ultimately seated was biased against him.

A statement induced by a false promise of reward or leniency is not a voluntary statement. *Roberts v. State*, 352 Ark. 489, 102 S.W.3d 482 (2003). When a police officer makes a false promise that misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been made voluntarily, knowingly, and intelligently. *Id.* For the statement to be involuntary, the promise must have induced or influenced the confession. *Id.*; *Bisbee v. State*, 341 Ark. 508, 17 S.W.3d 477 (2000), *overruled on other grounds in Grillot*, 353 Ark. 294, 107 S.W.3d 136. Furthermore, the defendant must show that the confession was untrue, because the object of the rule is not to exclude a confession of truth, but to avoid the possibility of a confession of guilt from one who is, in fact, innocent. *Id.* In determining whether there has been a misleading promise of reward or leniency, this court views the totality of the circumstances and examines, first, the officer's statement and, second, the vulnerability of the defendant.

*Williams*, 363 Ark. at 404–05, 214 S.W.3d at 834–35.

The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006). Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.*

Both Officer Volner and Montgomery testified at the suppression hearing. As previously noted, Montgomery was arrested at Sheridan's residence after Montgomery and others arrived with methamphetamine. Montgomery was taken to the police department, where Volner interviewed him the next day. Volner read Montgomery the *Miranda* rights at 12:37 p.m. Volner testified that he and Montgomery talked after he read Montgomery his rights, but before he began recording the interview. The recording did not begin until 2:35 p.m. According to Volner, he told Montgomery that if Montgomery were honest and helpful, he would include that in his report. Volner also testified that he did not threaten Montgomery in any way. In his statement, Montgomery admitted that he possessed methamphetamine and had intended to deliver it to Sheridan.

On cross-examination, Volner testified that Montgomery was working for someone who went by the name No Limit and that Montgomery offered to help Volner find No Limit. Volner stated that he told Montgomery that "any cooperation" on Montgomery's part "could help him down the road." Further, Volner explained that he would "tell [Montgomery's] defense counsel . . . or the prosecutor any cooperation that he did, but I couldn't make any promises because I don't quite have the title of the Prosecuting Attorney or a Judge." Volner denied that he had promised Montgomery he would serve no jail time. He also denied that he had threatened to set Montgomery's bond at $1 million if he did not give a statement.

Montgomery testified that Volner promised him probation if he gave a statement, and threatened him with a $1 million bond so that he "wouldn't see daylight again" if he failed to cooperate. Montgomery stated that he was fearful of staying in jail because he had overheard racist comments by other inmates. Further, he stated that he did not give his statement voluntarily. Montgomery stated that he was willing to do whatever he had to do to get out of jail, and that he would not have given a statement if Volner had not made him a promise and threatened him.

After hearing testimony from both Volner and Montgomery, as well as the arguments of counsel, the circuit court denied the motion to suppress. The circuit court found that Montgomery's statement was voluntary and that it was not induced by a threat or promise of reward. In addition, the circuit court stated that it did not find credible Montgomery's testimony that he was induced to make a statement by a promise of leniency or by threats from Officer Volner. At issue in this case was the conflict between the testimony of Montgomery and Volner regarding an alleged promise of leniency and an alleged threat regarding the amount of Montgomery's bond. We defer to the superiority of the trial judge to evaluate the credibility of witnesses who testify at a suppression hearing. *Holland v. State*, 365 Ark. 55, 225 S.W.3d 353 (2006). We will reverse a trial court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.* We cannot say that the circuit court abused its discretion in denying Montgomery's motion to suppress.

### Admission of Tape-Recorded Telephone Conversations

At the pretrial hearing on Montgomery's motion to suppress, Officer Volner testified that he recorded several telephone

conversations between Montgomery and Sheridan. The deputy prosecutor stated that a subpoena had been issued for Sheridan, but that his whereabouts were unknown and the subpoena had not been served. He further stated that Volner would testify that Sheridan had agreed to help arrange a drug buy with Montgomery by using Sheridan's cell phone while he was at the police department. At trial, the State called Jerome Lewis, who was in the car with Montgomery at the time of the phone calls with Sheridan. Lewis testified that he did not "know" Sheridan prior to that day, but that he had previously heard Sheridan's voice. He stated that he recognized Sheridan's voice on the tape, adding, "I never forget a voice." Lewis further testified that, as they drove to Paragould, Montgomery spoke to Sheridan on his cell phone about getting some money. Lewis stated that he had listened to the recordings of the telephone conversations and that both Montgomery's and Sheridan's voices were on the tapes. At that point, the tapes were played for the jury. After listening to the tapes, Lewis identified the voices on the tapes as those of Montgomery and Sheridan.

On appeal, Montgomery argues that the circuit court erred in admitting the tapes in violation of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* The following section of the Act is pertinent to this issue:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c).

Montgomery argues that, because neither he nor Sheridan testified at trial, there is no evidence that either of them consented to having their telephone conversations recorded. As such, he contends that the recordings were inadmissible. We disagree with Montgomery's assertion that there was *no* evidence of consent. Volner testified that Sheridan agreed to cooperate and initiate phone calls to Montgomery in an attempt to set up a controlled delivery of methamphetamine. It appears that Montgomery is arguing that a recording is admissible only if one of the parties to the communication expressly testifies that he or she consented to the recording.

No appellate court in this state has specifically addressed the issue. In *Mock v. State*, 20 Ark. App. 72, 723 S.W.2d 844 (1987),

the court of appeals rejected the appellant's argument that the trial court improperly admitted the transcripts of telephone conversations into evidence because the interception of those conversations was unlawful under 18 U.S.C. § 2511 (1982). The appellant contended that neither he nor the police informant consented to the taping of their conversations. The court of appeals noted that the evidence on the issue of consent was conflicting: at the suppression hearing a police officer testified that the informant had consented to the taping, but at trial the informant stated that his consent was not voluntarily given. Concluding that the question of consent turned upon the credibility of witnesses, the court of appeals deferred to the superior position of the trial judge and held that the transcripts were properly admitted into evidence.

In *Fields v. State*, 81 Ark. App. 351, 101 S.W.3d 849 (2003), the court of appeals inferred that a prosecutor who was investigating a crime consented to the recording of his telephone conversation because the other party to the conversation testified that he entered the conversation with knowledge that he was speaking with an official investigating a crime, and that he assumed that such a conversation would be recorded. Therefore, the court of appeals held that consent can be inferred from circumstances surrounding the communication.

Some courts have held that the unavailability of a consenting party to a conversation does not prevent proof of consent from being demonstrated by other means. *See, e.g., United States v. Gladney*, 563 F.2d 491 (1st Cir. 1977) (holding that absent any indication of coercion, a government agent's testimony that an informer who was unavailable for trial had consented to having a telephone conversation recorded was sufficient for the recording to be admitted); *United States v. Bonanno*, 487 F.2d 654 (2d Cir. 1973) (holding that an informer's consent to the monitoring or recording of a telephone conversation is incidental to his decision to cooperate with law-enforcement officers and that it will normally suffice for the government to show that the informer went ahead with a call knowing that the officers were present); *United States v. Traficant*, 558 F. Supp. 996 (N.D. Ohio 1983) (finding that the testimony of an FBI agent was sufficient to show that an unavailable informant consented to the recording).

In *United States v. Edmond*, 718 F. Supp. 988 (D.C. 1989), where consent to recording was shown via the testimony of police officers and agents of the Drug Enforcement Administration regarding circumstances surrounding the taping of conversations,

the court rejected the defendants' contention that the court could not evaluate the question of consent in a meaningful way without hearing from the informants themselves. The defendants argued that, because the court heard only from the law enforcement officers who supervised the recordings, the court could not appreciate the pressures which led to the informants' "consent." The court disagreed, stating:

> This argument misunderstands the test for "consent" in the wiretap context, and the evidentiary principles that flow from that standard. The substantive test for consent is not, as the defendants' argument would suggest, similar to that used to gauge a defendant's waiver of a constitutional right. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041 (1973) (test for consent in the constitutional context). Rather, the test for consent in the wiretap context is considerably less rigorous: an individual need only proceed despite his or her understanding that the conversation is being recorded. *See United States v. Fuentes,* 563 F.2d 527, 533 (2d Cir. 1977) ("[i]t will normally suffice [to prove consent] for the government to show that the informer went ahead with a [conversation] after knowing what the law enforcement officers were about") (quoting *United States v. Bonanno,* 487 F.2d 654, 658-59 (2d Cir. 1973)). . . .

> This substantive standard both informs the nature of the evidence that will be adequate to address a motion to suppress, and, as applied in this case, makes clear that the defendants' motion should be denied. The lenient substantive standard permits proof by circumstantial evidence. As articulated by Judge Friendly in *Bonanno,* the lower substantive standard reflects the fact that, unlike consent to a search, an informer's consent to a wiretap does him or her no additional harm: it is merely "an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him." 487 F.2d at 658. Thus, testimony regarding consent is sufficient if it shows that, in fact, the informer's actions were taken in furtherance of the "course of cooperation." Testimony of this type is nearly analogous to the testimony of a witness to a physical event, such as an automobile accident. In this context, the occurrence of that event — the perpetuation of the course of cooperation — can easily be shown by circumstantial evidence from the agents who witnessed the consent. Testimony from the informants themselves, while perhaps helpful, is not required.

*Edmond,* 718 F. Supp. at 992-93.

Here, even though Sheridan could not be located by the time of Montgomery's trial, Volner testified that Sheridan had agreed to cooperate with the officers and called Montgomery at Volner's discretion and in his presence. While it is clear that 18 U.S.C. § 2510 *et seq.* requires proof of consent, nothing in the statute indicates that consent can be shown only by the direct testimony of one of the parties to the recorded communication. We agree with the State's contention that Sheridan's decision to make the calls in the presence of officers, while obviously aware that the calls were being recorded, is sufficient evidence that he consented to have them recorded. Under the facts of this case, it was not necessary for either Sheridan or Montgomery to testify in order to show that either of them consented to the recordings. Thus, Montgomery fails to provide a basis for excluding the recordings pursuant to 18 U.S.C. § 2511.

Montgomery also argues that the recorded conversations were inadmissible as hearsay and that the admission of the tapes violated his constitutional right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution. As pointed out by the State, Montgomery does not explain how the conversations are hearsay or cite any provision of the hearsay rules that the tapes violated. Nor does he explain how his right to confront witnesses was violated by the admission of the tapes. This court does not address arguments that are not supported by authority or convincing argument. *See, e.g., Hathcock v. State*, 357 Ark. 563, 182 S.W.3d 152 (2004).

## Entrapment

Montgomery argues that the circuit court erred in rejecting his proffered instruction on the defense of entrapment. Arkansas Code Annotated § 5-2-209 (Repl. 2006), provides:

> (a) It is an affirmative defense that the defendant was entrapped into committing an offense.
>
> (b)(1) Entrapment occurs when a law enforcement officer or any person acting in cooperation with a law enforcement officer induces the commission of an offense by using persuasion or other means likely to cause a normally law-abiding person to commit the offense.
>
> (2) Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

Our law is well established that, if a defendant denies committing an offense, he cannot assert that he was entrapped into committing the offense. *Pyle v. State*, 340 Ark. 53, 8 S.W.3d 491 (2000); *Heritage v. State*, 326 Ark. 839, 936 S.W.2d 499 (1996); *Young v. State*, 308 Ark. 647, 826 S.W.2d 814 (1992).

■ At a hearing just before the trial began, the deputy prosecutor noted that Montgomery had indicated that he wished to raise the defense of entrapment. Counsel for Montgomery replied, "Judge, we're not going to admit that we committed this offense. So, if that in essence waives my entrapment defense, so be it. But we certainly don't admit that we committed this offense." At the close of the State's case-in-chief, Montgomery asked the court to instruct the jury on entrapment. The circuit court declined to instruct the jury on entrapment, finding that Montgomery had waived an entrapment defense prior to trial and that it was not fair to the State for Montgomery to attempt to raise the defense after the State had rested. We agree. It is clear from Montgomery's counsel's testimony that the defense of entrapment was waived prior to trial. We hold that the circuit court did not err in denying Montgomery's request to submit a jury instruction on entrapment.

Affirmed.