Vann TUCKER, Appellant,

v.

STATE of Arkansas, Appellee.

No. CR 10–919.

Supreme Court of Arkansas.

April 7, 2011.

Laws & Murdoch, P.A., by: Hugh R. Laws, Russellville, for appellant.

Dustin McDaniel, Att'y Gen., by: Kathryn Henry, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice.

Appellant Vann Tucker appeals from the judgment and commitment order finding him guilty of one count each of aggravated residential burglary and aggravated robbery and sentencing him to two life terms in the Arkansas Department of Correction. For reversal, he asserts that the circuit court (1) abused its discretion in failing to grant his motions for mistrial; (2) abused its discretion in failing to grant his motion for change of venue; and (3) erred in failing to grant his motion for directed verdict where there was no sufficient evidence corroborating the accomplices' testimony. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2010). We find no error and affirm.

The record reflects the following facts. On May 4, 2009, Tacara Wolfe, Appellant's accomplice, contacted her boyfriend, Chris Duvall, to ask if she could borrow his red Toyota Tacoma truck so that she could go look for a job. Duvall drove to Russellville to bring the truck to Wolfe, who was with Appellant and Wolfe's sister, Nicole Myers, Appellant's other accomplice. The foursome went to get some lunch and then dropped Duvall back at his house. Appellant, Wolfe, and Myers then went to the home of Myers's friend, Rocky Maggard. Myers introduced Appellant and Maggard and later overheard Maggard tell Appellant that someone owed him money. Then, Maggard asked Myers to go to his neighbor Billy Partain's house to see if anyone was home. He further instructed Myers to knock on the door, and if someone answered the door, she was to tell that person that her truck had run out of gas. According to Myers, if no one was home, the plan was to break into the house to steal money and guns.

Myers and Wolfe then went to Partain's house and knocked on the door. Once Partain opened the door, the women asked if they could use his phone to make a call because their truck had run out of gas. While talking with Partain, Myers noticed a shadow across the back of the house and Appellant, wearing a ski mask, came in. Myers and Wolfe went outside. Wolfe left on foot through some nearby woods, while Myers went back into the house where Appellant and Partain were on the floor scuffling. Partain was begging for his life, and Appellant told him no one would get hurt if he would stop squirming. Appellant ordered Myers to go to a bedroom to get some guns. She came back with three shotguns and a pistol. Myers put all the guns, along with a pair of binoculars and some shotgun shells, in a blue blanket, and she and Appellant left and returned through a field to Maggard's house.

Appellant, Myers, Wolfe, and Maggard then drove to Ronnie Ray's house, an acquaintance of Myers's, to sell him the stolen guns. Appellant decided to keep the pistol and sold Ray the three shotguns for approximately seventy dollars. Later, Appellant, Myers, and Wolfe met up at Myers's roommate's house in Russellville.

Once the police were notified of the robbery, they were dispatched to Partain's house to investigate. Partain identified Myers as being in his house immediately prior to the robbery. Myers and Wolfe were subsequently arrested and both implicated Appellant in the crimes, leading to his arrest and conviction as set forth previously. This appeal followed.

### I. *Sufficiency of the Evidence*

Although raised as his third argument on appeal, we must first consider Appellant's argument that the circuit court erred in failing to grant his motion for directed verdict because of double-jeopardy concerns. *See Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. Specifically, Appellant asserts that the only evidence that places him at the scene of the crime is the testimony of his accomplices, and in the absence of any corroborating evidence if the accomplice evidence is excluded, then there is insufficient evidence supporting his convictions, particularly where there was no physical evidence linking him to the crimes. The State counters that this argument is without merit, as sufficient corroborating evidence was presented.

 We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Taylor v. State*, 2011 Ark. 10, 370 S.W.3d 503. In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

 When accomplice testimony is considered in reaching a verdict, Arkansas law provides that a person cannot be convicted based upon the testimony of an accomplice "unless corroborated by other evidence tending to connect the defendant ... with the commission of the offense." Ark.Code Ann. § 16–89–111(e)(1)(A) (Repl. 2005). Furthermore, "corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof." Ark.Code Ann. § 16–89–111(e)(1)(B) (Repl.2005). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not toward corroborating the accomplice testimony. *Taylor*, 2011 Ark. 10, 370 S.W.3d 503; *Stephenson v. State*, 373 Ark. 134, 282 S.W.3d 772 (2008). The corroborating evidence need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to connect to a substantial degree the accused with the commission of the crime. *Stephenson*, 373 Ark. 134, 282 S.W.3d 772. The test is whether, if the testimony of the accomplice is completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Taylor*, 2011 Ark. 10, 370 S.W.3d 503. The corroborating evidence may be circumstantial as long as it is substantial; evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *Id.* In addition, if an accomplice's testimony is corroborated as to some particular fact or facts, the jury is authorized to infer that he speaks the truth as to all.

*Id.; Bennett v. State,* 284 Ark. 87, 679 S.W.2d 202 (1984).

Arkansas Code Annotated section 5–12–103(a) (Repl.2006), states that a person commits aggravated robbery if he or she commits a robbery as defined in Arkansas Code Annotated section 5–12–102 (Repl. 2006), and the person:

(1) Is armed with a deadly weapon;

(2) Represents by word or conduct that he or she is armed with a deadly weapon; or

(3) Inflicts or attempts to inflict death or serious physical injury upon another person.

Arkansas Code Annotated section 5–39–204(a) (Supp.2009) provides that a person commits aggravated residential burglary if he or she commits residential burglary as defined in Arkansas Code Annotated section 5–39–201 (Supp.2009) of a residential occupiable structure occupied by any person, and he or she:

(1) Is armed with a deadly weapon or represents by word or conduct that he or she is armed with a deadly weapon; or

(2) Inflicts or attempts to inflict death or serious physical injury upon another person.

In the instant case, Myers testified that she was with her sister, Wolfe; Wolfe's boyfriend, Chris Duvall; and Appellant on May 4, 2009. She stated that the foursome, who were in Duvall's red Toyota Tacoma truck, had lunch and then dropped Duvall at his house in Atkins before going to Rocky Maggard's house. Myers stated that after introducing Maggard and Appellant, she overheard Maggard telling Appellant that someone owed him money. Maggard told Myers to go to Partain's home to see if anyone was there, and if so to tell the person her car had run out of gas. Myers stated that while inside Partain's house, she saw Appellant, wearing a ski mask, come in the back of the house. She and Wolfe went outside and, while Wolfe left on foot back through the woods to Maggard's house, Myers went back in and found Appellant scuffling with Partain and that Appellant was trying to tie up Partain with some phone cord. At one point, Myers saw Appellant hold a knife to Partain's throat. She stated that Appellant told her to go to the bedroom to look for guns. She came back out with three shotguns and a pistol. She testified that she put the guns, along with shotgun shells and a pair of binoculars in a blue blanket, and she and Appellant left. First, they got into a small, black pickup truck, but after Appellant was unable to drive a stick shift, he turned the truck around and parked it back in a shed next to Partain's house. Myers stated that after she and Appellant returned to Maggard's house, they got Wolfe and Maggard and went to Ronnie Ray's house to sell the guns. Myers further stated that after leaving Ray's and dropping off Appellant and Maggard, she and Wolfe again met up with Appellant at the home of Layla Kendrick, Myers's roommate.

Wolfe testified similarly to Myers that after having lunch with her boyfriend, Duvall, and borrowing his truck, she, Appellant, and Myers went to Maggard's house. Wolfe stated that she heard Maggard talking about having previously done some work for Partain and noticing that he had a lot of cash. She stated that she went with her sister to Partain's house but left after seeing a shadow move across a back window. She then went back through the woods and was sitting in the truck when Maggard came out of the house and asked her, "Did you get it?" She later saw Myers and Appellant come through the field and noticed Appellant carrying a blue blanket. Wolfe also stated that the foursome went to Ray's house to sell the guns

and that Appellant was the one doing the selling. They returned to Russellville where they dropped Maggard and Appellant off but later met up again with Appellant at Kendrick's apartment.

In addition to this testimony, the following corroborating testimony was presented. Chris Duvall testified that he received a call from Wolfe on May 4, asking to borrow his truck. He further stated that when he took the truck to her she was with Myers and Appellant and that the four of them went to eat lunch before they dropped him off at his house. He stated that the truck was not returned to him until sometime after midnight.

Juliana Halford, who lives across the street from Partain, testified that at approximately 4:15 p.m. on May 4, 2009, she heard Partain on her front porch, asking for help. She stated that he was upset, had duct tape and phone cord all over him, and told her that he had just been robbed. Halford also stated that she noticed that Partain's truck, which is usually parked in the shed facing south, was turned around, facing north.

Kendrick testified that she knew Myers and Wolfe and recalled that they arrived at her apartment in a red truck that she had not seen before. She stated that she opened the door and saw Appellant, Wolfe, and Myers.

Ray testified that Appellant, Myers, Wolfe, and Maggard showed up at his house in a red Tacoma truck, and that Appellant told him he had some guns he wanted to get rid of. Ray stated that he bought three shotguns, some shells, and a pair of binoculars. He said Appellant also left behind a blue blanket. Ray also stated that Appellant had a pistol but did not want to sell it. The three guns identified by Ray, as the ones he bought from Appellant, were subsequently identified by Partain as the ones stolen from him on May 4.

Officer Jason Smith with the Pope County Sheriff's Office testified that he went to Partain's house around 4:30 p.m. on May 4, 2009. He stated that he discovered some impressions in the grass leading from the front of the residence to the rear that he followed across a ditch, through a fence, and into a field behind the residence to Maggard's residence. He also noticed some shotgun shells in the grass. Officer Smith also testified that he noticed a black S–10 pickup truck parked in front of the residence under a shed, facing north. On the hood of the truck was some white phone cord and gray duct tape.

Officer Adolph White testified that on May 9, 2009, he came into contact with Appellant during a traffic stop. As Officer White went back to his car, Appellant drove off, and a chase ensued. By the time Officer White caught up with Appellant, he had wrecked the car he was driving. In inspecting the wreck, Officer White discovered a .22–caliber pistol just outside the vehicle. The pistol was later identified by Partain as the one stolen from his house on May 4.

Officer Rowdy Sweet of the Pope County Sheriff's Office testified that he Mirandized Appellant before talking to him about the incident that occurred on May 4, 2009. The next day, Appellant asked to speak with Officer Sweet again. Appellant mentioned that Officer Sweet had made a statement about a knife, and Appellant then told the officer that he had had the knife for a long time and never held it to a man's throat. Officer Sweet responded that he never said Appellant used the knife, just that it was in his possession.

Billy Partain testified that about 3:00 p.m. on May 4, 2009, he was asleep in a recliner when two women knocked on his door. They asked to use the phone because their car had broken down. He

allowed the women in and then a man grabbed him from behind and threw him to the floor. The man told the women to find something to tie up Partain. One of the women returned with duct tape, which the assailant used to bind Partain's ankles and hands. He said the man continued to choke him and threatened to kill him if he did not tell him where the money was. The man then put a knife to Partain's throat and told him, "I'm gonna cut your throat. I'm gonna kill you if you don't tell me where your money is." The man went through Partain's pockets and took the money he found there. Partain said one of the women went to his bedroom and took all of his guns, which included three shotguns and a .22–caliber pistol. They also took a pair of binoculars and some shotgun shells. He said they wrapped the items in a blue electric blanket. After they left, Partain managed to free himself and went across the street to a neighbor's house to call the police. Partain also stated that Rocky Maggard was his neighbor and that he had known him since he was a child. When asked if Maggard could have been his attacker, he said the voice of the attacker was different from Maggard's voice, so he did not believe Maggard was the one who had attacked him, although Partain did admit that he thought his attacker was bigger than Appellant.

Considering all this evidence, we hold that the State provided sufficient evidence to corroborate Myers's and Wolfe's testimony. Even eliminating Myers's and Wolfe's testimony, the remaining evidence presented independently establishes the crimes and tends to connect Appellant with their commission. In addition to the witnesses who testified about Appellant being with Myers and Wolfe on the day of the crimes, the State presented Ray's testimony that Appellant had sold him the three shotguns that were identified as being the ones stolen from Partain. Although Appellant asserts that Ray's testimony cannot constitute sufficient evidence because he lacked credibility, this assertion is without merit, as issues of credibility are left to the trier of fact. *See Loggins v. State*, 2010 Ark. 414, 372 S.W.3d 785.

Moreover, the State presented evidence that Appellant fled from officers after a traffic stop. This court has held that flight following the commission of an offense is a factor that may be considered with other evidence in determining probable guilt and may be considered as corroboration of evidence tending to establish guilt. *Strong v. State*, 372 Ark. 404, 277 S.W.3d 159 (2008).

Accordingly, there is no merit to Appellant's argument that the State failed to present sufficient corroborating evidence, and we affirm on this point.

## II. *Mistrial*

Next, Appellant argues that the circuit court erred in denying two separate motions for mistrial. Appellant asserts that in both instances the impartiality of the adjudicator was prejudiced and an admonition could not have cured that prejudice.

A mistrial is a drastic remedy and should be declared only when there has been an error so prejudicial that justice cannot be served by continuing the trial and when it cannot be cured by an instruction to the jury. *Sweet*, 2011 Ark. 20, 370 S.W.3d 510; *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007). An admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Zachary v. State*, 358 Ark. 174, 188 S.W.3d 917 (2004). The circuit court has broad discretion in granting or denying a motion for a mistrial, and this court will not reverse the circuit court's decision absent an abuse of

discretion. *Williams v. State,* 371 Ark. 550, 268 S.W.3d 868 (2007).

The first motion for mistrial came after the following colloquy during voir dire:

THE COURT: Do any of you know any reason if you are chosen as a juror that you could not be absolutely fair and impartial and base your verdict strictly upon the law as given to you and the evidence learned from the witness stand?

PROSPECTIVE JUROR: (*She indicates affirmatively*)

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR: I remember the original case.

THE COURT: Well I was just asking a while ago, ma'am, without stating you know—

PROSPECTIVE JUROR: Yes, sir.

THE COURT: —was there anything that you know about the facts that led to the filing of the Information in this case. You're making reference to something that occurred sometime back?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Well, you know, in criminal cases they are decided on facts and evidence that are presented in court; and I take it this may be something you read in the newspaper or something or heard on the radio?

PROSPECTIVE JUROR: Yes, and from friends.

THE COURT: And, from someone who you have talked to?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And, of course, based upon what you are telling me you understand that cases are decided by facts and evidence that are presented from the witness box. Let me ask you and again without telling me what you know about this, can you lay aside that impression and decide this case based solely upon the facts and evidence presented in this case and follow the law, the instructions that I give to you?

PROSPECTIVE JUROR: I would try, sir. I'm afraid I would be a little prejudiced but I would try hard.

Thereafter, the court continued to question the juror but did so at the bench, out of the hearing of the other prospective jurors. After the juror returned to her seat, the attorneys continued the side-bar conference with the court. Appellant first challenged the juror for cause and then subsequently moved for a mistrial, arguing that the entire jury pool had been tainted by the statement. The circuit court denied the motion for mistrial and took under advisement Appellant's motion to strike the juror for cause. Appellant did not request an admonition.

The State argues that this point on appeal is without merit because Appellant failed to object at the first opportunity. Alternatively, the State asserts that the circuit court did not abuse its discretion because the juror never mentioned any specific previous crime, arrest, or conviction and, thus, Appellant was not prejudiced.

We turn first to the issue of whether the mistrial motion was timely. This court has consistently held that a motion for mistrial must be made at the first opportunity. *See, e.g., McCoy v. State,* 2010 Ark. 373, 370 S.W.3d 241; *Ellis v. State,* 366 Ark. 46, 233 S.W.3d 606 (2006). The policy behind this rule is that a trial court should be given an opportunity to correct any error early in the trial, perhaps before any prejudice occurs. *Dorn v. State,* 360 Ark. 1, 199 S.W.3d 647 (2004).

Here, the circuit court made the inquiry and the prospective juror made the statement about "the original case." Then the court further questioned the juror be-

fore finally asking the juror to approach the bench to ask more in-depth questions. After the prospective juror returned to her seat, Appellant first moved to strike the juror for cause and then finally moved for a mistrial. Clearly, Appellant did not move for a mistrial at the first opportunity; thus, we will not consider this argument on appeal.

■ Appellant next argues that the court abused its discretion in refusing to grant his motion for a mistrial after a witness referenced Appellant's previous criminal history during her testimony. The following colloquy that occurred during defense counsel's questioning of accomplice Wolfe is the subject of Appellant's argument:

> DEFENSE COUNSEL: It's also important to tell in your statement that you dropped Vann Tucker off at 2 o'clock that afternoon, isn't it?
>
> WOLFE: Yes.
>
> DEFENSE COUNSEL: And, you didn't say that in your statement?
>
> WOLFE: I didn't mention his name at all because I was scared to mention his name.
>
> DEFENSE COUNSEL: Why didn't you tell the statement that you dropped him off at 2?
>
> WOLFE: Because I didn't want to mention his name. I had already—when I got arrested they told me he'd killed somebody—
>
> DEFENSE COUNSEL: It's—you're—
>
> WOLFE: —and he had held the sheriff hostage.

Thereafter, Appellant moved for a mistrial, arguing that Wolfe's statement was made voluntarily and was not in response to his question. According to Appellant, the statement was prejudicial and tainted the minds of the jurors. The circuit court denied the motion for mistrial on the basis

that the response had been invited by Appellant's line of questioning. The court, however, provided the following admonition:

> Ladies and Gentleman of the Jury, the last response from the witness that was given just a moment ago, you shall disregard that response. You shall not consider that response for any purpose in your deliberations of this matter or for any purpose forward at this point in time from this witness. Thank you.

■ We must first determine whether the statement constitutes invited error. Under the doctrine of invited error, we have held that one cannot be heard to complain of that error for which he was responsible. *McGhee v. State*, 330 Ark. 38, 954 S.W.2d 206 (1997). Here, in reviewing the questioning that led up to Wolfe's statement regarding the prior incidents involving Appellant, it is clear that such questioning was the cause of Wolfe's statement. Wolfe previously stated that she was scared to mention Appellant's name but counsel again asked why she never mentioned dropping him off. Although defense counsel did not intend for Wolfe to make such a statement, it nevertheless was made in response to his questioning. Where a witness's answer was a legitimate response to a question posed by defense counsel, such testimony was invited by the appellant and the circuit court did not abuse its discretion in refusing to declare a mistrial. *See Woods v. State*, 342 Ark. 89, 27 S.W.3d 367 (2000); *Hogan v. State*, 281 Ark. 250, 663 S.W.2d 726 (1984). As a result, Appellant cannot now complain of any error that may have resulted.

### III. *Change of Venue*

■ As the final point on appeal, Appellant argues that the circuit court abused its discretion in denying his motion for change of venue. In asserting that he was

entitled to a change of venue, Appellant states that there had been much publicity in Pope County related to an incident for which he was initially charged with capital murder, as well as stories about his previous escape attempts and holding the sheriff hostage in his office. Appellant argued that because of this publicity he was unable to get a fair trial in Pope County. The State counters that this argument is without merit as Appellant failed to meet his burden of demonstrating that he was unable to receive a fair trial in Pope County.

The United States and Arkansas Constitutions entitle a defendant to a fair trial. *Wallace v. State*, 2009 Ark. 90, 302 S.W.3d 580; *Swindler v. State*, 267 Ark. 418, 592 S.W.2d 91 (1979). If, because of pretrial publicity, an impartial jury cannot be seated to try a defendant, his right to a fair trial is violated. *Swindler*, 267 Ark. 418, 592 S.W.2d 91; *see also Wallace v. State*, 2009 Ark. 90, 302 S.W.3d 580. This court has held that a criminal case may be removed to a circuit court of another county upon a showing that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had. *Montgomery v. State*, 367 Ark. 485, 241 S.W.3d 753 (2006); *Collins v. State*, 338 Ark. 1, 991 S.W.2d 541 (1999). The burden is on the defendant to show the general mindset of the populace and the concomitant impossibility of receiving a fair trial. *Montgomery*, 367 Ark. 485, 241 S.W.3d 753. In making a determination of the accused's ability or inability to receive a fair trial, the circuit court has an opportunity to observe witnesses and to make a determination as to whether a particular mindset or prejudice pervades the entire county. *Id.* We will not disturb the finding of the circuit court in the absence of an abuse of discretion. *See Wallace*, 2009 Ark. 90, 302 S.W.3d 580.

Appellant's assertion that he was entitled to a change of venue is based on publicity that surrounded his arrest and subsequent plea agreement to a charge of second-degree murder in the death of Fred Kain. Following Appellant's arrest on that charge, there were also reports about escape attempts and a standoff with authorities while Appellant was in the Pope County Detention Center. These events and the resulting publicity occurred in late 2000 and into 2001, almost ten years prior to Appellant's trial in this case. Thus, the excessive publicity that Appellant claims prejudiced him was almost a decade old.

In an attempt to support his contention that he could not get a fair trial in Pope County, Appellant submitted the affidavits of two electors in Pope County and also presented their testimony at the hearing on the motion for change of venue. The first elector was Terry Bowie, a resident of Pope County since 1994. While Bowie testified to his many social associations throughout the county, the crux of his testimony was that he had heard some people in the county make negative comments about Appellant and, thus, he did not believe that Appellant could receive a fair trial in Pope County.

Similarly, Scott Taylor, a Pope County resident since 1989, testified about his involvement in the community and stated that he had heard people talk about Appellant being a bad kid. Thus, Taylor stated, he did not believe Appellant could receive a fair trial in the county. However, this court has held that affidavits filed in support of a motion for change of venue that cite little or nothing beyond an affiant's own conviction that a fair trial is not possible are insufficient to suggest an abuse of discretion. *Wallace*, 2009 Ark. 90, 302 S.W.3d 580.

Moreover, we have held that there can be no error in the denial of a motion for change of venue if the transcript of the jury-selection process shows that an impartial jury was selected, due to the fact that voir dire of the jury provides adequate safeguards against pretrial publicity. *Id.* Here, the record reveals that of the jurors seated in Appellant's trial, none indicated that they could not be impartial. Further, only one of the jurors indicated that she had read or heard something about Appellant in the past, but stated that there was nothing that would prejudice her against him. In fact, Appellant does not allege that the jury that was seated was biased against him. As we have stated, a defendant is not entitled to jurors who are totally ignorant of the facts surrounding the case, as long as they can set aside any impression they have formed and render a verdict solely on the evidence at trial. *Id.*; *Baughman v. State,* 353 Ark. 1, 110 S.W.3d 740 (2003).

In sum, Appellant has failed to demonstrate that he did not receive a fair trial as a result of the circuit court's denial of the motion to change venue. Accordingly, we cannot say the circuit court abused its discretion in denying the motion.

### IV. *Rule 4–3(i) Review*

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2010), the record in this case has been examined for all objections, motions, and requests made by either party that were decided adversely to Appellant, and no prejudicial error has been found.

Affirmed.