Cite as 2023 Ark. 186

# SUPREME COURT OF ARKANSAS

**No.** CR–23–72

| | | |
|---|---|---|
| JACOBY GOEHLER | | **Opinion Delivered:** December 7, 2023 |
| | APPELLANT | APPEAL FROM THE FULTON COUNTY CIRCUIT COURT [NO. 25CR-21-35] |
| V. | | |
| | | HONORABLE TIM WEAVER, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | <u>AFFIRMED</u>. |

**CODY HILAND, Associate Justice**

On October 21, 2022, a jury in the Fulton County Circuit Court found Jacoby Goehler guilty of the first-degree murder of Davidlee Stansbury and sentenced him to life in prison, plus fifteen years in the Arkansas Department of Correction. Goehler appeals his conviction. We affirm.

## I. *Factual and Procedural Background*

### A. Crime and Arrest

In early April 2021, Goehler walked into his living room to find his sister telling their parents that Goehler's best friend, Stansbury, had raped her in the previous year. Testimony revealed the Goehler family previously moved to Salem, Arkansas, after Goehler's brother was sexually assaulted in Oklahoma. Additionally, not only did Goehler's wife attempt suicide just hours before Goehler learned about his sister and Stansbury, but also, Goehler's mother historically struggled with drug abuse and bipolar disorder.

After Goehler told his friend, Travis Barker, that he believed his sister's accusation, he traveled to Barker's home in Jefferson City, Missouri, on April 22, 2021. While there, Barker showed Goehler a handgun he had recently repaired. Later that night, Goehler told Barker he wanted to kill Stansbury. Barker replied, "Let's go." In possession of the aforementioned gun, the two men left Barker's home in Goehler's truck and drove back to Salem, Arkansas.

Goehler called Stansbury on the road and convinced him to accompany Goehler to a remote place to pick up a fictitious bag of drugs. Goehler dropped Barker off at Barker's Arkansas property where he waited while Goehler picked up Stansbury at approximately 4:00 a.m. Upon arrival, the three walked into the woods, scaled a fence, and entered a more secluded area. As they walked, Goehler repeatedly asked Stansbury if he had raped Goehler's sister. Stansbury denied doing so.

Eventually the group stopped near a large boulder. Goehler asked Stansbury once more whether he had raped Goehler's sister, and Stansbury again said no. Goehler then took out the pistol and shot Stansbury in the hand. Goehler then shot him again, this time in the head. After Stansbury had fallen, Goehler stood over him and shot him a third time, again, in the head. Goehler then directed Barker to help him look for the shell casings, but they could not find them. They left Stansbury's body and drove back to Barker's Missouri home.

Goehler returned to Salem the next day where he met his wife at their home and told her he shot Stansbury three times, killing him as revenge for the rape. While Goehler's parents and brother were also present, it is not clear whether they overheard the conversation. Later that same evening, Goehler called his squad leader in the Arkansas

2

National Guard and asked for a lawyer because he had killed someone. The squad leader eventually put Goehler in touch with the commanding officer. After Goehler informed him he had shot his best friend, the commanding officer contacted another National Guard member employed by the Arkansas State Police, and Goehler was arrested.

While in custody, Goehler told a Fulton County jail detainee he had shot Stansbury. After the police Mirandized Goehler, Goehler requested counsel, and law enforcement stopped all questioning and contacted the public defender. Goehler's counsel then told police not to speak with Goehler anymore.

After three days passed following Goehler's arrest, the search for Stansbury's body was unsuccessful. A deputy then told Fulton County Sheriff Al Roark that Goehler wanted to speak with him. Roark approached Goehler's jail cell, and Goehler asked if they could talk. Roark agreed, but he told Goehler he would not ask any questions. When Goehler heard a search helicopter fly by, he asked Roark if the police had found Stansbury's body. Roark said no. Goehler replied that they would not find it, then asked to call his lawyer. Roark tried to get the public defender on the phone, but he was out of state on vacation. Goehler then asked to call his wife. After the call ended, Goehler motioned Roark over and said, "If you'll let me smoke a cigarette[,] I'll take you to the body." When Roark told Goehler he ought to talk to his attorney, Goehler refused, saying, "You're not going to find him, but I'll take you to him."

Roark again Mirandized Goehler, after which Goehler rode along to guide the police to Stansbury's body. He showed the officers where they should be able to find spent shell casings, of which they found two, both from the same 9mm handgun. They did not recover

3

the murder weapon. After they returned to the jail, law enforcement filed the criminal information and officially charged Goehler with murder in the first degree.

## B. Circuit Court Proceedings

On May 13, 2021, Goehler's defense attorney filed a motion with the Circuit Court of Fulton County to suppress statements Goehler made while in police custody without his attorney present. The court did not hold a suppression hearing and made no rulings regarding those statements.

Over a year later, the defense moved to change venue, claiming that public interest in the case was significant and so adverse to Goehler that his trial would be unfair. The pretrial process continued, including routine voir dire of the jury. On October 19, 2022, the first day of trial, the court denied Goehler's motion for change of venue.

The State called Goehler's wife as a witness, and Goehler claimed that spousal privilege allowed him to prevent her from testifying. The court allowed her to testify, though it sustained a hearsay objection Goehler later raised regarding Stansbury's last words.

On the second day of trial, the State introduced an autopsy photograph of Stansbury's face and the uppermost portion of his torso. The court admitted the photograph over Goehler's objection that it was substantially more prejudicial than probative.

At the end of trial, Goehler requested that the court give jury instructions regarding the lesser-included offenses of manslaughter and second-degree murder. The court denied this request as well, and on October 21, 2022, Goehler was convicted of first-degree murder and sentenced to life in prison plus fifteen years for using a firearm.

## II. *Points on Appeal*

A.  Goehler's Incriminating Statements

Goehler maintains that the trial court erred in admitting incriminating statements he made in police custody without counsel present as well as statements made after he requested counsel and after counsel directed police to no longer speak with Goehler.

This court generally will not hear issues of error that were not preserved below. Goehler did not object to this evidence at trial. But he asserts that this court can nevertheless address this issue for the first time on appeal through an exception outlined in *Marshall v. State*, 316 Ark. 753, 760, 875 S.W.2d 814, 819 (1994). He then argues we should weigh the totality of the circumstances and find that the trial court's admission of Goehler's statements into evidence violated his Fifth and Sixth Amendment rights according to *Bussard v. State*, 295 Ark. 72, 747 S.W.2d 71 (1988).

1.  *The* Wicks *exception*

In four circumstances, this court may review an issue of error not presented to the trial court. *See Marshall*, 316 Ark. at 760, 875 S.W.2d at 819. Goehler's proffered exception arises "when evidentiary errors affect a defendant's substantial rights although they were not brought to the court's attention." *Id*. We first recognized this exception in *Wicks v. State*, considering it arguably possible based on language in Uniform Evidence Rule 103(d) that we reasoned could apply "at most . . . only to a ruling to admit or exclude evidence." 270 Ark. 781, 787, 606 S.W.2d 366, 370 (1980).

Here, the trial court made no such ruling. While the record shows that the defense filed a motion to suppress, among other things, "[a]ny statement or statements made by [Goehler]," it contains no transcript of a suppression hearing for this court to review. Absent

a ruling, and given this exception's restricted scope, we decline to extend it to the facts of this case; thus, we affirm the trial court on this point. We need not analyze this case under *Bussard* because no exception shields Goehler from the general rule that this court does not address issues of error not preserved below. *See Bussard*, 295 Ark. 72, 747 S.W.2d 71.

## B. Goehler's Motion for Change of Venue

This court reviews a denial of a motion to change venue for abuse of discretion. *Porter v. State*, 359 Ark. 323, 324, 197 S.W.3d 445, 446 (2004). A trial court properly grants change of venue if it is clear the defendant could not likely receive a fair trial in the county. *Id.* The law does not entitle a defendant to jurors who are ignorant of his case, but only to those jurors who can set aside any impressions they might have and make decisions based on the evidence alone. *Id.* at 324, 197 S.W.3d at 446–47.

Because voir dire sufficiently protects a defendant against publicity before trial, the court does not err in denying a motion for change of venue when the transcript shows that the court selected an impartial jury. *Tucker v. State*, 2011 Ark. 144, at 17, 381 S.W.3d 1, 11. Here, the record reveals a robust voir dire involving fifty-four potential jurors and a 113-page transcript. The parties made their allotted strikes from the panel to their satisfaction. When potential jurors expressed concerns about their fitness to serve, the trial court respectively dismissed or retained them after careful questioning and deliberation with both sides. Finally, most potential jurors' concerns were personal and independent of public interest, social media, or other coverage about the case. The potential jurors who said public opinion had swayed them were excused by the court after both parties agreed.

6

The court did not abuse its discretion in denying Goehler's motion to change venue, and Goehler has not shown that his trial was unfair because of this denial. Accordingly, we affirm.

## C. Testimony of Goehler's Wife

When the State called Goehler's wife as a witness, Goehler sought to exclude her testimony pursuant to the spousal-privilege rule. Ark. R. Evid. 504. Rule 504 allows a criminal defendant to prevent his or her spouse from testifying about anything the two communicated in confidence exclusively to one another. At trial, Goehler argued that what he had told his wife, he had told no one else, and intended to keep the communication between the two of them. The State disagreed, characterizing the testimony as little more than repeating what Goehler had already told others, and therefore, it was unprivileged. The trial court permitted Goehler's wife to testify.

On appeal, Goehler maintains that his wife's testimony included confidential, privileged matters. The State responds that Goehler waived his privilege concerning anything significant that he disclosed to third parties under Arkansas Rule of Evidence 510.

In admitting the testimony of Goehler's wife, the trial court made an evidentiary ruling this court will not reverse absent an abuse of discretion. *See, e.g.*, *Bragg v. State*, 2023 Ark. 66, at 7, 663 S.W.3d 375, 380. Abuse of discretion requires thoughtlessness, improvidence, or lack of due consideration on the trial court's part—not merely error. *Id.* at 7, 663 S.W.3d at 381.

Arkansas Rule of Evidence 504(b) extends the spousal privilege to "confidential communication between the accused and the spouse," and Rule 504(a) defines

7

"confidential" as what is private and meant to remain that way. Rule 510 negates that privilege once the defendant chooses to share with a nonspouse "any significant part of the privileged matter."

Yet waiver need not pertain to this case. The parties stipulated that Goehler told his wife *and* others that he had killed Stansbury. That fact, then, was never privileged under Rule 504. Goehler contests the admission of his wife's testimony about how many times he shot Stansbury, but Goehler's friend and accomplice, Travis Barker, also testified that he saw Goehler shoot Stansbury three times. So this fact likewise enjoyed no Rule 504 privilege. Even if it had been privileged when Goehler's wife presented it, Barker's identical testimony would have come before the jury.

All that remains at issue is the testimony of Goehler's wife revealing Stansbury's last words, which the trial court excluded by sustaining Goehler's hearsay objection. Though it was too late to "unring" the bell, the jury simply hearing this testimony did not prejudice Goehler. Goehler could have requested a limiting instruction but did not do so. The trial court did not abuse its discretion. We affirm on this point.

D. The Photograph of the Victim

On the second day of trial, the State offered into evidence a photograph of Stansbury. Goehler objected and argued that the "grotesque" photograph, which depicts Stansbury's partially decomposed face and the tops of his shoulders but does not show the wounds that caused his death, was substantially more prejudicial than probative. The State asserted the evidence tended to show that Goehler purposely killed Stansbury. The court admitted the

8

photograph over Goehler's objection, reasoning that the image showed the jury "the consequence of what the State is saying is purposeful conduct."

We reverse a trial court's admission of photographs only if that admission abused the court's discretion. *Anderson v. State*, 2011 Ark. 461, at 9, 385 S.W.3d 214, 220–21. Generally, photographs clarifying testimony are admissible; a trial court need not exclude such a photograph merely because it is inflammatory or cumulative. *Robertson v. State*, 2011 Ark. 196, at 4. Even a "gruesome" photograph may come in if it can assist the jury in any of several ways, including "showing the condition of the victim's body." *Id.*

The record contains a bench discussion over the photograph. Both parties had sufficient opportunity to argue their perspectives on its relevance and potential prejudicial effect. Before admitting the photograph, the court conceded it was "difficult to look at," but went on to explain that to see the condition of Stansbury's body would help the jury better understand the result of Goehler's actions and decide whether his conduct was purposeful; an element of the first-degree murder charge. These were proper, adequately reasoned grounds to admit the photograph despite its graphic nature.

The trial court was neither thoughtless nor improvident, nor did it fail to duly consider the matter. We affirm.

### E. The Jury Instructions on Lesser-Included Offenses

At the close of evidence, Goehler sought to introduce jury instructions on manslaughter, which means to cause someone's death under otherwise murderous circumstances while experiencing "extreme emotional disturbance for which there is a reasonable excuse." Ark. Code Ann. § 5-10-104(a)(1) (Repl. 2013). The trial court ruled

there was no rational basis for a manslaughter instruction. Goehler then sought instruction on second-degree murder, which can involve a knowing killing "under circumstances manifesting an extreme indifference to the value of human life." Ark. Code Ann. § 5-10-103(a)(1). The trial court likewise found no rational basis for this instruction, reasoning that there was no doubt Goehler purposely killed Stansbury.

We review a trial court's rulings concerning jury instructions for abuse of discretion. *Marshall v. State*, 2021 Ark. 158, at 3, 627 S.W.3d 810, 811. If even the slightest evidence supports giving an instruction, a trial court commits reversible error by refusing to give it. *Id*. But a trial court need not give instructions on a lesser-included offense unless there is a rational basis for acquitting the defendant of the charged crime and instead convicting him of the lesser. *Id*., at 3, 627 S.W.3d at 812; Ark. Code Ann. § 5-1-110(c).

1. *Manslaughter*

Goehler would have this court consider several facts: (1) Goehler's sister said that Stansbury had raped her; (2) Goehler's wife attempted suicide; (3) Goehler's family suffered other sexual abuses; and (4) Goehler's accomplice, Travis Barker, encouraged Goehler to act. Goehler argues these facts support a manslaughter instruction because they are at least slight evidence he killed Stansbury in the heat of reasonably excusable passion.

With the exception of Travis Barker, none of the other events occurred in the timeframe immediately preceding the murder of Stansbury. We have repeatedly held that a killing meriting a manslaughter instruction must occur "in the moment following some kind of provocation" like a fight or threat. *See Davis v. State*, 2011 Ark. 433, at 4 (per curiam).

10

Goehler waited nearly three weeks before visiting Barker, discovering Barker had a gun, and devising a plan to lure Stansbury to a remote location in the woods under a false premise of finding drugs. As he, Stansbury, and Barker walked through the woods, Goehler repeatedly asked Stansbury if he had raped Goehler's sister, which Stansbury denied each time. There is no evidence that either of these men ever threatened one another along the way, and Goehler was the only one armed. When the group eventually stopped near a boulder, Goehler shot Stansbury—not during a struggle—but while standing some feet away. The first bullet passed through Stansbury's hand, and before Stansbury could do more than express confusion and surprise, Goehler shot him in the head at closer range. Then, after standing over Stansbury's body for some moments, Goehler shot him again in the head.

These circumstances do not lend themselves to a manslaughter instruction because they do not demonstrate Stansbury (or anyone or anything else) provoked Goehler by threatening or fighting with him just before he fired the shots. Instead, they reveal calculated action. The trial court did not err when it found no rational basis for acquitting Goehler of his charged crime, first-degree murder, and instead convicting him of manslaughter. And it did not err in refusing to give such instructions to the jury.

2. *Second-degree murder*

Goehler argues that the following evidence supports an instruction for second-degree murder: (1) Goehler shot Stansbury first in the hand; (2) the two men were several feet apart; and (3) they were deep in the woods at night. His position is that these facts could lead a jury to believe that Goehler killed Stansbury under circumstances showing his extreme indifference to the value of human life. The State responds that the law does not require

second-degree-murder instructions when fatal gunshot wounds are not point-blank; it was not too dark for the men to scale a fence to reach the place where Goehler stopped them or for Goehler to shoot Stansbury in the head twice; and the location's remoteness highlights that Goehler's actions were purposeful.

We agree with the State that *Britt v. State*, 344 Ark. 13, 38 S.W.3d 363 (2001), controls the outcome here. In *Britt*, we affirmed the trial court's refusal to instruct the jury on second-degree murder where all the evidence revealed a purposeful, execution-style killing, and there was no evidence that the defendant had acted with any mental state other than with the purpose of killing the victims. *Id.* at 23, 38 S.W.3d at 370. Reincorporating the facts mentioned above, there was no evidence that Goehler acted only knowingly and with extreme indifference. On the contrary, the evidence shows that he formed and then realized a plan for the purpose of taking Stansbury's life.

### III.    *Rule 4-3(a) Review*

Because Goehler received a life sentence, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to him in compliance with Arkansas Supreme Court Rule 4–3(a) (2021), and no prejudicial error has been found.

Affirmed.

*Digby Law Firm*, by: *Mathew R. Ingle*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen., for appellee.